# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | No. 3:17-CR-00124-2 |
| ) | CHIEF JUDGE CRENSHAW |
| MAURICE DUNCAN BURKS ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION

On May 14, 2018, the Court entered an Order that, in relevant part, reads:

Defendant Maurice Burk's Motion to Dismiss Indictment Due to Pre-Indictment Delay (Doc. No. 373) is hereby set for an EVIDENTIARY HEARING at 9:00 a.m. on July 3, 2018, with an expected duration of two hours. The Court finds an evidentiary hearing to be appropriate because, while the Government offers generalized and vague explanations for the delay in the return of the Indictment (such as the need for further investigation and a change in personnel in the prosecutor's office), it offers nothing concrete to explain the delay. See United States v. Valona, 834 F.2d 1334, 1340 (7th Cir. 1987) ("The district court has wide discretion in determining how it receives evidence on a motion to dismiss based upon pre-indictment delay. It may hold a hearing, rely on pleadings and affidavits alone, or combine the two."); United States v. Glynn, No. 3:13-00059, 2015 WL 2125082, at *4 (M.D. Tenn. May 6, 2015) (declining to hold an evidentiary hearing, but recognizing that it is a matter of "wide discretion"); United States v. Farr, No. CR-06-0191-F, 2007 WL 141893, at *2 (W.D. Okla. Jan. 16, 2007) (observing that "[e]xceptionally long periods of delay become increasingly difficult to explain away as inoffensive 'investigative delay,'" and noting that, "[a]though an evidentiary hearing is not required in every case where pre-indictment delay is in issue . . . th[e] failure to hold an evidentiary hearing regarding these issues may constitute a handicap to the reviewing court").

(Doc. No. 446 at 1-2). This single paragraph prompted the Government to file a 22-page Motion for Reconsideration (Doc. No. 453).

## I.

The Motion for Reconsideration is a rebuke of Burks's arguments and this Court's decision to hold an evidentiary hearing. It argues that "[t]o permit the defense to collect discovery on what

is presently a factually-bankrupt, legally-frivolous motion, would reward the defense for misstating the law, and would potentially endanger the lives and safety of witnesses the government intends to call at trial in this case." (Doc. No. 453 at 6).

In his Motion, Burks cited the Supreme Court's decision in United States v. Lovasco, 431 U.S. 783 (1977), which the Government claims is "the seminal case on pre-indictment delay," (Doc No. at 3); characterized United States v. Marion, 404 U.S. 307 (1972) (on which Lovasco was based) as "imposing a substantial burden on a defendant to obtain the relief sought in the instant pleading"; and quoted both Marion, 404 U.S. at 324 and United States v. Copley, 774 F.2d 728, 730 n.2 (6th Cir. 1985) for the proposition that dismissal of an indictment is appropriate only if (1) it is shown that the pre-indictment delay caused substantial prejudice to a fair trial and (2) the Government's delay was an attempt to obtain a tactical advantage over the accused. Apparently, Burks "misstated the law" because he did not discuss the same Sixth Circuit law that the Government utilized in formulating its response.

Regardless, the Court is (and was) fully aware of the requirements for establishing unlawful delay and understands that "[t]he standard . . . is nearly insurmountable." United States v. Rogers, 118 F.3d 466, 477 (6th Cir. 1997). The Court did not shift the burden from Burks to establish either actual prejudice or intentional governmental misconduct. The Court simply set the matter for a hearing to explore the reason(s) for the delay.

In responding to Burks's Motion to Dismiss, the Government relied heavily on Lovasco wherein the Supreme Court set forth "good reasons for placing a substantial burden on defendants" who seek dismissal on due process grounds. (Doc. No. 400 at 3). True enough, but Lovasco, in conjunction with Marion, 404 U.S. at 325 "make[] clear that proof of prejudice is generally a

2

necessary but not sufficient element of a due process claim, and that *the due process inquiry must consider the reasons for the delay* as well as the prejudice to the accused." Lovasco, 431 U.S. at 789 (emphasis added). Who, other than the Government, better knows the actual reasons for the delay? See United States v. Grier, 121 F.3d 710 (6th Cir. 1997) (stating that "Fifth Amendment due process rights are generally not implicated where, as here, the government offers a plausible reason for the delay"); United States v. Engstrom, 965 F.2d 836, 839 (10th Cir. 1992) ("The government . . . attributes the delay to its belief that plea negotiations would bear fruit, and to a heavy and active criminal docket in its office with a consequent number of shifts of the case from one Assistant U.S. Attorney to another."); United States v. Walker, 710 F.2d 1062, 1069 (5th Cir. 1983) (observing that "the government has shown adequate non-oppressive reason for the nine-month delay between state arrest and federal trial"); United States v. King, 593 F.2d 269, 272 (7th Cir. 1979) (holding that Lovasco requires "the defendant to prove actual prejudice, after which showing it is up to the court to balance the reasons asserted by the Government against the prejudice asserted by the defendant"). It is one thing to add the actual reason for the delay into the mix, quite another to require the Government to shoulder the burden of proving that the delay did not result in a tactical advantage. The Court suggested no such requirement in its Order.

The Government also argues that it was a "clear error of law" for the Court to rely on Valona, Farr, and (to a lesser extent) Glynn in setting the matter for a hearing. It then spends four pages explaining how the facts in each of those cases was different. The short answer to this is twofold. First, virtually every case is distinguishable either procedurally or factually, but this does not mean that their general holdings or observations cannot be applied in other circumstances. Second, the Government has not negated the propositions that (1) a district court has "wide

3

discretion" in determining what to consider in deciding a motion to dismiss based on pre-indictment delay, Glynn, 2015 WL 2125082, at *3, including "hold[ing] a hearing," Valona, 834 F.2d at 1340, or (2) that the failure to hold a hearing can hamper review, especially when the delay is long, Farr, 2007 WL 141893, at *2. The Government effectively concedes as much when it argues:

> A district court considering a motion to dismiss due to pre-indictment delay may, of course, receive evidence in support of or against the motion in a variety of ways. In addition to holding an evidentiary hearing, the court may consider the representations of counsel in court, . . . the representations in parties' filings with the court, . . . stipulations entered into by the parties, or the court's impressions and understandings gleaned in the course of litigation . . . . There is no requirement, however, that district courts must hold evidentiary hearings on such motions. To the contrary: hearings only become necessary, if at all, after a defendant has met the heavy burden of establishing that an evidentiary hearing is warranted in the first place, by satisfying the two-prong test above.

(Doc. 453 at 11) (internal citations omitted).

The Government's apparent position that a hearing cannot be granted unless or until a defendant establishes the two-prong test appears to be grounded on the Sixth Circuit's decision in Rogers, 118 F.3d at 475 (emphasis added) which held that "[t]o prove unconstitutional pre-indictment delay, the *defendant must first prove* 'substantial prejudice' to his right to a fair trial." The Court does not read Rogers or its progeny as requiring definitive proof of prejudice before considering the improper motive prong, or setting a hearing on pre-indictment delay.

In Rogers, the Sixth Circuit did not stop at the prejudice prong, even though that was not established. Rather, the court stated that "[e]ven if [defendant] had established actual substantial prejudice, he failed to satisfy the second part of the test for unconstitutional pre-indictment delay: 'that the delay was an intentional device by the government to gain a tactical advantage.'" Id. at 476. Likewise in United States v. Montgomery, 491 F. App'x 683, 691 (6th Cir. 2012) the Sixth Circuit considered whether "delay was an intentional device used by the government to gain a

4

tactical advantage," even though defendant could not show prejudice.  Similarly, in United States v. Toaz, 59 F. App'x 94, 99 (6th Cir. 2003) the Sixth Circuit stated that "even if [defendant] had established substantial prejudice, he failed to establish that the delay was an intentional device by the government to gain a tactical advantage" because "[t]he government presented evidence " to the contrary.  In fact, "[b]ecause a defendant must meet both parts of the test to warrant dismissal of the indictment, [a court] need only address one part if the defendant's showing on that part is not sufficient," and that includes focusing solely on the second part of the test.  United States v. Baltimore, 482 F. App'x 977, 981 (6th Cir. 2012) ("Baltimore has offered nothing to rebut the government's assertion—and the district court's finding—that the government continued to investigate and build its case until indictment."); see also  United States v. Greene, 737 F.2d 572, 574 (6th Cir. 1984) ("To have this indictment dismissed [defendant] must meet both parts of the test. We consider the latter part of the test first.").  Thus, it was reasonable and within the Court's discretion to want to consider both parts of the test in tandem, and to issue a fair and informed decision based upon more, rather than less, information.

## II.

All of the foregoing aside, the Government in its Motion for Reconsideration provides at last a fuller explanation as to the reason for the delay, and the Court can rely on those representations in making its decision.  See, Rogers, 118 F.3d at 476–77 (citing Lovasco, 431 U.S. at 796 for the proposition that a court may rely upon counsel's representations as to the reason for the delay); United States v. Thomas, 404 F. App'x 958, 961 (6th Cir. 2010) ("Even when the government cites its own court filings rather than offering sworn testimony on the investigative reasons for the delay, we may accept the government's representations about the reason for delay.").  This seems

5

particularly appropriate in a case where the Government has expressed concerns about witness safety and the pre-trial disclosure of evidence, and where the grand jury has found probable cause to believe that one or more of the Defendants have engaged in obstruction of justice, witness tampering, and the even murder of a witness.

By way of summary, the Government's representations suggest the following:

For many years, local law enforcement agencies in and around the Clarksville, Tennessee area were faced with a rash of homicides, attempted murders, drive-by shootings, robberies, instances of drug trafficking, unlawful firearm possession, and witness intimidation allegedly committed by members of the Gangster Disciples. Oftentimes, state prosecutions went nowhere because (1) "witnesses could not or would not come forward to testify," (2) "the Gangster Disciples intimidated persons from testifying," (3) "the gang creed prohibited any cooperation with law enforcement," and (4) "gang members who did come forward were assaulted or murdered by members of the Gangster Disciples." (Doc. No. 453 at 15). Against this backdrop, the federal government entered the picture with a view towards "secur[ing] additional witnesses and develop[ing] evidence to solve the homicides and other acts of violence that state prosecutors were not able to pursue." (Id.).

The federal investigation began in mid-2013 after agents with the Bureau of Alcohol, Tobacco, and Firearms ("ATF") "developed a source with intimate and substantial knowledge about the criminal activities of the Gangster Disciples in the Middle District of Tennessee[.]" (Id. at 16). Proffers from that source "developed dozens of investigative leads into the criminal activities of the Gangster Disciples dating back over an approximately 15-year period, including instances of drug trafficking, assaults, robberies, burglaries, acts of obstruction of justice and witness tampering, and

6

acts of murder and attempted murder, including dozens of potentially gang-related shootings." (Id.). After consulting with federal prosecutors, ATF agents sought out additional sources and evidence in an effort to confirm what they had learned. Their efforts included interviewing additional witnesses; reviewing numerous case files from state authorities, jail records, medical records of victims, and financial records; installing pole cameras for surveillance; and conducting surveillance of Gangster Disciples, both in and outside Clarksville

Later in 2013, the government developed a second source who "also had intimate and substantial knowledge about the criminal activities of the Gangster Disciples in the Middle District of Tennessee[.]" (Id. at 17). That source recorded dozens of conversations with other gang members, provided details of their meetings to agents, permitted agents to surveil and photograph some of the meetings, and conducted controlled buys of illegal drugs.

Between 2013 and 2015, numerous Gangster Disciples were indicted on firearms and drug trafficking charges. Also during this period, agents in this jurisdiction and elsewhere conducted controlled buys from targets of the investigation, and some of those purchases serve as a basis of the racketeering and drug conspiracies in this case.

In 2015, after conducting more than 100 interviews with potential witnesses, and securing the testimony of more than 70 of them, the Government was in a position to make a "systematic and sustained" presentation to the grand jury. (Id. at 17-18). This was a lengthy process because the grand jury in this district only meets two days a month, and the Government needed to insure that cooperating witnesses would actually cooperate. This sometimes required the drafting of "lengthy prosecution memoranda" and plea agreements that required supervisory approval, both here and in Washington, D.C. (Id. at 18). Additionally, between the start of the investigation and the return of

the Indictment, at least three different federal prosecutors had been assigned to the case, and "ATF agents . . . generated more than 800 reports of investigation detailing their investigative activities in this case." (Id. at 18).

On June 29, 2017, the grand jury returned a forty-five page, forty count Indictment against eleven Defendants. Since then, the Indictment has been twice superseded. The present charges are wide ranging and include murder in aid of racketeering, and a racketeering conspiracy that allegedly lasted twelve years. With regard to Burks, the Second Superseding Indictment charges conspiracy to participate in racketeering activity (Count One); conspiracy to distribute and possession with intent to distribute cocaine, crack cocaine, Oxycodone, Methadone, Hydrocodone, and marijuana (Count 2); unlawful possession of ammunition by a convicted felon (Count Ten); murder in aid of racketeering (Count Eleven); using, carrying, or possessing a firearm during and in relation to a crime of violence (Count Thirteen); and murder resulting from the use, carrying, or possession of a firearm during and in relation to a crime of violence (Count Fourteen), with Counts Eleven and Fourteen apparently relating to the death of Malcolm Wright. Because of the nature and scope of the charges, the Court has declared the case complex for purposes of the Speedy Trial Act. (Doc. No. 239 at 2).

The foregoing representations of what went into the return of the Indictment is more than sufficient to dispel any suggestion by Burks that the Government withheld indicting him in an effort to gain a tactical advantage. "Indeed, a defendant's right against preindictment delay is circumscribed in substantial part by a defendant's equally vital interests in freedom from indictment prior to a showing of probable cause consistent with the Fourth Amendment[.]" United States v. Brown, 959 F.2d 63, 66 (6th Cir. 1992). "Rather than deviating from elementary standards of 'fair

8

play and decency,' a prosecutor abides by them if he refuses to seek indictments until he is completely satisfied that he should prosecute and will be able promptly to establish guilt beyond a reasonable doubt." Lovasco, 331 U.S. at 795.

This is true, even if, as Burks claims, his "name was mentioned as possibly being involved in Malcolm Wright's killing as early as April 9, 2013," (Doc. No. 373 at 3-4), and that recent discovery suggest that Burks was a suspect "four days (4) after the shooting." (Doc. No. 459 at 5, n. 6). As the Supreme Court in Lovasco explained:

> [R]equiring the Government to make charging decisions immediately upon assembling evidence sufficient to establish guilt would preclude the Government from giving full consideration to the desirability of not prosecuting in particular cases. The decision to file criminal charges, with the awesome consequences it entails, requires consideration of a wide range of factors in addition to the strength of the Government's case, in order to determine whether prosecution would be in the public interest. Prosecutors often need more information than proof of a suspect's guilt, therefore, before deciding whether to seek an indictment.

Id. at 794, 97 S. Ct. 2044. There is absolutely nothing to suggest that the mere mention of Burks's name at a point early in the Government's investigation was indubitable proof that Burks was involved in Wright's murder, or that his identification as a suspect four days made the case against him prosecutable at that time.

It is also true "even if his defense may have been somewhat prejudiced by the lapse of time." Id. 431 U.S. at 796; accord United States v. Lively, 852 F.3d 549, 566 (6th Cir. 2017). Instead, Burks must "demonstrate that he was actually and substantially prejudiced by the delay," United States v. Schaffer, 586 F.3d 414, 424–25 (6th Cir. 2009), which he has not done.

Burks insists that his "investigation and defense has been unconstitutionally hindered by the passage of time; resulting in difficulties in locating witnesses (and the faded memories of those he can locate); and difficulties in locating records." (Doc. No. 373 at 2-3). This is wholly insufficient

9

to support a pre-indictment delay claim.

Under Sixth Circuit law, a "claim that [defendant] was prejudiced because of witnesses' loss of memory must fail as a matter of law" because that court "ha[s] held that loss of memory is an insufficient reason to establish prejudice." United States v. Wright, 343 F.3d 849, 860 (6th Cir. 2003) (citing Payne v. Rees, 738 F.2d 118, 121–22 (6th Cir.1984)). "Similarly, the mere absence of records is not enough to establish actual prejudice." United States v. Corona-Verbera, 509 F.3d 1105, 1113 (9th Cir. 2007). There must be at least some showing that records would have been exculpatory, and that they became lost as a result of delay. United States v. Carruth, 699 F.2d 1017, 1019 (9th Cir. 1983). "Bare assertions," United States v. Vaughn, 444 F. App'x 875, 879 (6th Cir.2011), vague allegations, United States v. Farias, 836 F.3d 1315, 1325 (11th Cir. 2016), and speculation, United States v. Ford, 328 F. App'x 377, 378 (9th Cir. 2009), will not suffice to show prejudice. See United States v. Muñoz-Franco, 487 F.3d 25, 58 (1st Cir. 2007) ("With respect to prejudice, a defendant must do more than allege that witnesses' memories had faded or that evidence had been lost that might have been helpful to him."); United States v. Bartlett, 794 F.2d 1285, 1290 (8th Cir. 1986) (collecting cases) ("The defendant also must relate the substance of the testimony which would be offered by the missing witnesses or the information contained in lost documents in sufficient detail to permit a court to assess accurately whether the information is material to the accused's defense.").

The primary protection against stale prosecutions is the statute of limitations. Lovasco, 431 U.S. at 789; Schaffer, 586 F.3d at 425. For this reasons, a defendant who seeks dismissal on due process grounds carries the burden of establishing both substantial prejudice and intentional misconduct. Rogers, 118 F.3d at 476. As already noted, this presents (at least in the Sixth Circuit)

a "standard [that] is nearly insurmountable," id. at 477 n. 10 (6th Cir.1997). Based on the record that is now before the Court, Burks's Motion to Dismiss must therefore be denied.

### III.

On the basis of the foregoing, the Government's Motion for Reconsideration (Doc. No. 453) will be granted, and the evidentiary hearing will be cancelled. Burk's Motion to Dismiss Indictment Due to Pre-Indictment Delay (Doc. No. 373) will be denied. That denial will be without prejudice to Burks reasserting his pretrial delay motion if he is able to show that the delay substantially prejudiced his defense, and the government intentionally delayed indictment in order to gain a tactical advantage.

An appropriate Order will be entered.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE