# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **No. 3:17-cr-00124** |
| **[1] MARCUS TERMAINE DARDEN** | ) | **Chief Judge Crenshaw** |
| **[2] MAURICE DUNCAN BURKS** | ) | |
| **[3] BRANDON DURELL HARDISON** | ) | |
| **[5] DERRICK LAMAR KILGORE** | ) | |
| **[6] ELANCE JUSTIN LUCAS** | ) | |
| **[7] DECARLOS TITINGTON** | ) | |
| **[8] LAWRENCE MITCHELL** | ) | |
| **[9] LORENZO CORTEZ BROWN** | ) | |
| **[10] XAVIER RAPHAEL JENKINS** | ) | |
| **[11] REX ANDREW WHITLOCK** | ) | |
| **[12] JAMES ANDERSON LUKE** | ) | |

## MEMORANDUM OPINION AND OMNIBUS ORDER

In this criminal case, the Government alleges that the 12 named Defendants are or were members of the Gangster Disciples who operated in and around Clarksville, Tennessee.[1] Count One is a conspiracy count brought under the Racketeer Influence Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(a), and alleges that the Gangster Disciples is a criminal organization whose members and associates engaged in wide-ranging criminal behavior. Forty-four other Counts fill out the controlling Second Superseding Indictment (Doc. No. 380), and charge assorted crimes, including narcotics distribution, firearms trafficking, unlawful possession of firearms and ammunition, intimidation of witnesses, and acts of violence involving murder, attempted murder, and assault.

---

[1] One Defendant, Lamar Andre Warfield, remains a fugitive, another Defendant, Lawrence Mitchell, has entered a plea.

The case set is for a two month trial beginning March 1, 2019, and the parties have filed dozens of substantive Motions in anticipation thereof. By Order entered January 29, 2018 (Doc. No. 344), the Court set aside the week of November 26-30, 2018 for hearings on pending motions. Upon review of the Motions that have been filed, however, it is clear that a hearing is unnecessary for many of them and they are resolved in this Memorandum Opinion and Omnibus Order. The remaining Motions will be scheduled for hearing at a precise date and time during the week previously set aside.

## I. Motions to Join

Several Defendants have filed Motions to Join in Motions filed by other Defendants. These include: (a) Decarlos Titington's "Motion to Join in and Adopt CoDefendant Burk's Motion for Daily Transcripts" (Doc. No. 572); Marcus Darden's "Motion to Join Co-Defendant Burks' Motion [to] Compel Notice of Intent to Offer Evidence of Other Crimes, Wrong or Acts" (Doc. No. 645); and (c) James Anderson Luke's "Motion to Adopt and Join CoDefendants Pretrial Motions" (Doc. No. 701).[2] Those Motions are **GRANTED**.

## II. Motions for Daily Transcripts

Some Defendants have filed Motions for Daily Trial Transcripts or variants thereof. In response, the Government "take[s] no position as to defendants' requests and submits defendants' motions to the discretion of the Court," (Doc. No. 670 at 1), but then cites a number of cases suggesting that the right to daily transcripts is not of a constitutional dimension.

"[T]he decision to supply daily transcripts to indigent defendants is a matter within the

---

[2] The Government partially opposes Motion (Doc. No. 740), but it is unpersuasive. Obviously, Luke's joinder is limited to the arguments and theories raised by others only as they pertain to the alleged crimes and Counts in which he is charged.

discretion of the trial judge." United States v. Bari, 750 F.2d 1169, 1181 (2d Cir. 1984). Indeed, while the Guide to Judicial Policy states that "[t]he furnishing of accelerated transcript services in criminal proceedings should be discouraged," it also "recogniz[es] that there are some circumstances in which such transcript services are necessary and required by either the prosecution or the defense." Guide to Judiciary Policy, Vol. 7, Ch. 3, § 320.30.20.

Though not addressing daily transcripts, the Supreme Court in Britt v. North Carolina, 404 U.S. 226, 227 (1976) stated that "Griffin v. Illinois, [51 U.S. 12 (1956)] and its progeny establish the principle that the State must, as a matter of equal protection, provide indigent prisoners with the basic tools of an adequate defense or appeal, when those tools are available for a price to other prisoners." The Court in Britt also observed that "[w]hile the outer limits of that principle are not clear," it "has identified two factors that are relevant to the determination of need: (1) the value of the transcript to the defendant in connection with the appeal or trial for which it is sought, and (2) the availability of alternative devices that would fulfill the same functions as a transcript." Id.

Given the anticipated length of the trial, the nature, scope and breadth of the charges, the number of witnesses likely to be called including cooperating witnesses, the voluminous discovery that has been provided, and the fact that many of Defendants are represented by one lawyer, the Court finds that daily transcripts will be invaluable and that there is no appropriate substitution for such transcripts.[3] It may be that not all Defendants need transcripts for each witness who testifies because the evidence does not pertain to them, or is not of great significance. However, rather than adopting an *ad hoc* approach whereby some Defendants receive some transcripts, while others receive transcripts for different witnesses, daily transcripts will be made available for all witnesses

---

[3] This ruling is, of course, subject to change if only a few Defendants actually go to trial.

who testify. That said, the Court expects counsel to exercise discretion in ordering transcripts, so as to keep the transcription costs and/or copy costs down by requesting transcripts only where truly necessary to provide "an adequate defense."

The previously-mentioned Guide to Judicial Policy also quotes a Resolution adopted by the Judicial Conference in March 1980 and modified in September 1986 that provides:

> That in those cases where accelerated transcript services are provided, the party from whom the request or order emanates shall pay for the original, and if the requesting or ordering party is other than defense counsel appointed under the Criminal Justice Act, the CJA counsel shall be entitled to a copy at the copy rate.
>
> That the present practice, in some districts, of routinely apportioning the total cost of accelerated transcript services equally among the parties should be abandoned.

Id. Thus, if the Government requests daily transcripts, the costs shall be born by it, with CJA counsel responsible for paying the copy rate and thereafter seeking reimbursement from CJA funds.

Based on the foregoing, the Motions for Daily Transcripts filed by Maurice Burks (Doc. No. 563), and Derrick Kilgore (Doc. No. 637) are **GRANTED**, as is Brandon Hardison's "Motion for 'Real Time' Transcription" (Doc. No. 640) to the extent he seeks daily transcripts. To the extent Hardison's request for "real time" relates to following the testimony during the questioning of a witness, the Court simply notes that screens are provided on counsel's table and, absent technical glitches, counsel can read along as the testimony is being transcribed.

### III. Motions to Increase Peremptory Challenges

Hardison and Burks have both filed Motions for Additional Peremptory Challenges. Hardison requests that Defendants be allowed to exercise twenty (20) challenges jointly with the other defendants, with the Government being allowed to exercise twelve (12) challenges. Similarly, Burks "requests an adequate number of peremptory strikes to eliminate biased or questionable jurors

and select a fair and impartial jury," and "moves the Court to increase the number of peremptory challenges to twenty (20), or to such an extent as the Court deems proper, to assure a fair trial." (Doc. No. 643 at 2).

Rule 24(b) of the Federal Rules of Criminal Procedure provides that in a non-capital felony case,[4] "the government is entitled to 6 peremptory challenges and the defendant or defendants jointly have 10 peremptory challenges when the defendant is charged with a crime punishable by imprisonment of more than one year." Fed. R. Crim. P. 24(b). The rule goes on to provide that "the court may allow additional peremptory challenges to multiple defendants, and may allow the defendants to exercise those challenges separately or jointly." Id. A district court's decision regarding peremptory challenges is reviewed for an abuse of discretion, so long as it "[c]omplies with the minimum requirements of Rule 24[.]" United States v. Gibbs, 182 F.3d 408, 435 (6th Cir. 1999).

If this case goes to trial in its present posture, the Court is inclined to grant Defendants' request to increase the number of peremptory challenges while at the same time correspondingly raising the number of Government peremptory challenges, so as to preserve the same ratio as that set forth in Rule 24.[5] However, and as the Government points out in its response (Doc. No. 697), the trial in this case is months away, and the Court at this point in time has no way of knowing

---

[4] At present, only Defendant Hardison is subject to the possibility of the death penalty.

[5] In his response brief, Burks argues that because "to undersigned counsels' knowledge there have been absolutely no media reports prejudicial to the Government, but there have been such reports in relation to the Gangster Disciples," it "makes no sense to grant additional peremptory strikes to the party suffering from the prejudicial publicity, then negate that effect by granting additional peremptory challenges to the party that has suffered no prejudicial publicity." (Doc. No. 768 at 3). Assuming Burks' characterization of the reporting is accurate, Burks fails to account for the fact that any number in the increase of peremptory challenges is not due to exclusively to publicity. Instead, the increase relates to the number of Defendants, the number and nature of the charges, and the ratio set forth in Rule 24.

which Defendants may go to trial and on what counts.  Accordingly, a ruling on the Motions to Increase Peremptory Challenges (Doc. Nos.  639 & 643) is **DENIED**.  Said denial is **WITHOUT PREJUDICE** to raising the issue again at the Final Pretrial Conference scheduled for February 14 and 15, 2019.

## IV. <u>Motion to Pay for Childcare Costs</u>

Burks has filed a "Motion for the Court to Pay For Care of Dependent Children and Family Members of Single Parents Who Are Selected as Jurors" (Doc. No. 564).  In it, he writes:

> 2. Mr. Burks is entitled to a trial by a fair and impartial jury composed from a fair cross-section of the community pursuant to his rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.
>
> 3. In major cases generally, and particularly in cases which last as long as Maurice Burks' trial is expected to last, a large percentage of single parents, especially single African-American parents and women, are struck for cause by the Court due to the fact that they have no money to pay for alternative child care arrangements during a trial the length of Mr. Burks', or no money to pay for alternative care of dependent (usually elderly) family members during such a lengthy trial.
>
> 4. The Government's interest in not causing undue juror hardship does not outweigh the Accused's constitutional rights to a fair jury trial.
>
> 5. As a result of a jury selection process in which jurors who cannot afford child care are excluded, Maurice Burks may face a venire pool that is non-representative of a general cross-section of the community because certain poor and/or African-American individuals and/or women are removed due to hardships imposed by the length of the trial anticipated in Mr. Burks' case.

(<u>Id.</u> at 2).  He then cites <u>Duren v. Missouri</u>, 439 U.S. 357 (1979) and <u>Taylor v. Louisiana</u>, 419 U.S. 522 (1975) (mis-cited as <u>Brown v. Louisiana</u>) for the proposition that, in the absence of payment of dependent care, the jury selection process will violate not only his "right to a fair and impartial jury composed from a fair cross-section of the community," but also his right to equal protection under <u>Batson v. Kentucky</u>, 476 U.S. 79 (1986).  As for funding, Burks claims the "Court can order that the

costs of such care be taxed as costs in this case, just at it can order the costs of transportation, room and board be taxed as cost for any sequestered jury" pursuant to 28 U.S.C. § 1871(e).

Turning to the latter point first, the cited statute has nothing to do with paying for child or elder care in the routine case. Rather, it provides:

> (e) During any period in which a jury is ordered to be kept together and not to separate, the actual cost of subsistence shall be paid upon the order of the court in lieu of the subsistence allowances payable under subsection (d) of this section. Such allowance for the jurors ordered to be kept separate or sequestered shall include the cost of meals, lodging, and other expenditures ordered in the discretion of the court for their convenience and comfort.

28 U.S.C. § 1871(e). Even assuming that dependent care expenses comes within the ambit of "convenience and comfort," no sequestration order has been entered in this Court. The remainder of the statute deals with non-sequestered juries and permits fees for such things as meals, lodging, parking, travel, and tolls, but mentions nothing about child or elder care.

Funding aside, Burks has not shown that the failure to provide funding for childcare will deny him equal protection or result in him being tried by a jury that is not a fair-cross section of the community. Batson, on which he relies, applies to peremptory strikes by the government against certain classes of persons. J.E.B. v. Alabama *ex rel.* T.B., 511 U.S. 127, 130–31(1994), on which Burks also relies, "reaffirm[ed] what, by now, should be axiomatic: Intentional discrimination on the basis of gender by state actors violates the Equal Protection Clause, particularly where . . . the discrimination serves to ratify and perpetuate invidious, archaic, and overbroad stereotypes about the relative abilities of men and women." The scenario presented by Burks, however, does not arise from peremptory challenges or state action, but rather challenges for cause based on a potential juror's own request to be excused.

Duren and Taylor also do not aid Burks. Taylor merely holds that a male defendant had standing to challenge the systematic exclusion of women from jury pools, and that "the fair-cross-section requirement is violated by the systematic exclusion of women." Taylor, 419 U.S. at 531. Duren, decided four years later, applied Taylor to state statutes that automatically exempted from jury service any women requesting not to serve, and held that "such systematic exclusion of women that results in jury venires averaging less than 15% female violates the Constitution's fair-cross-section requirement." 439 U.S. at 360. Duren went on to hold that "[i]n order to establish a *prima facie* violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process." Id. at 364.

In his Motion, Burks does not discuss the Duren factors, let alone try to establish them. True, the systematic exclusions of African-Americans, Strauder v. State of W. Virginia, 100 U.S. 303, 311(1879), Hispanics, Castaneda v. Partida, 430 U.S. 482, 492 (1977), and women, Taylor, is unlawful, but it does not automatically follow that "a mixed race-gender group – such as African–American [fe]males – can constitute a distinctive group under Duren." United States v. Barlow, 732 F. Supp. 2d 1, 27 (E.D.N.Y. 2010) (collecting cases); see also, United States v. Greer, 900 F. Supp. 952, 957–58 (N.D. Ill. 1995) ("The Court concludes that recognizing the subgroup of African–American males as a Duren distinctive group would amount to pursuing a level and type of representativeness that is simply not demanded by the Sixth Amendment, which requires only a cross-section that is fair, not one perfectly attuned to multiple variables."). And it certainly does not

follow that a mixed, race-gender-marital-parental-economic status group – such as an indigent African-American female single mother – to the exclusion of all others – should be deemed a distinctive group for purposes of <u>Duren</u>.

Regardless, Burks' complaint is not about unlawful exclusion by the Court or the Government, but about the possibility that certain individuals will seek to be excused because of family care issues. Setting to the side whatever implicit bias might be suggested by Burks' unstated premise that poor African-American men or women (or poor females in general) would be more sympathetic to his plight, this possibility exists for any a number of potential jurors be they Caucasian, Asian, Hispanic, male, female, married or unmarried, employed or unemployed.

Simply put, the probability that some jurors will not be able to serve because of child or elder care responsibility does not mean that Burks or the other Defendants will not be tried by a jury representing a fair cross-section of the community. To the contrary, even in the context of exclusion by statute, the Supreme Court in <u>Duren</u> "recognize[d] that a State may have an important interest in assuring that those members of the family responsible for the care of children are available to do so. An exemption appropriately tailored to this interest would, we think, survive a fair-cross-section challenge." 439 U.S. at 359. The same can be said about jurors who seek to be excused because of responsibilities relating to caring for their children or other relatives.

Accordingly, Burks' Motion for the Court to Pay For Care of Dependent Children and Family Members of Single Parents Who Are Selected as Jurors (Doc. No. 564) is **DENIED**.

### V. <u>Motion to Preclude Evidence of Overt Acts Previously Adjudicated</u>

Burks is named in six counts in the controlling Second Superseding Indictment. In Count One, an alleged RICO conspiracy, Burks is alleged to have engaged in 11 overt acts, including overt

act "x." Overt act "x" states that "on or about February 4, 2010, Burks possessed with intent to distribute and distributed cocaine in Hopkinsville, Kentucky." (Doc. No. 380 at 14). Pursuant to the Double Jeopardy Clause of the Fifth Amendment, Burks requests that the Court prohibit the Government from introducing any evidence of overt act "x" because, in a Western District of Kentucky (Case No. 5:13-CR-54 (W.D. Ky, 2013), he was previously charged with, and plead guilty to, possessing with intent to distribute cocaine on the date and place alleged in overt act "x." More specifically, he pled guilty to seven charges contained in the Western District of Kentucky Indictment for which he received a 60 month sentence (Doc. No. 696-4 at 3), including that on February 4, 2010, he knowingly and intentionally distributed 10.686 grams of a mixture and substance containing a detectable amount of cocaine. (Doc. No. 692-2 at 2).

The Double Jeopardy Clause of the Fifth Amendment commands that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const. amend. V. It protects a criminal defendant from being tried twice for the same offense, United States v. Dinitz, 424 U.S. 600, 606 (1976), and protects against the imposition of multiple punishments for the "same act or transaction [that] constitutes a violation of two distinct statutory provisions," Rutledge v. United States, 517 U.S. 292, 297 (1996) (citation omitted).

In Garrett v. United States, 471 U.S. 773 (1985), the Supreme Court held that prosecution for a continuing criminal enterprise ("CCE") offense after an earlier prosecution for one of the predicate offenses is constitutional under the Double Jeopardy Clause. In arriving at its decision, the Supreme Court observed:

> Where the same conduct violates two statutory provisions, the first step in the double jeopardy analysis is to determine whether the legislature – in this case Congress – intended that each violation be a separate offense. If Congress intended that there be only one offense – that is, a defendant could be convicted under either statutory

provision for a single act, but not under both – there would be no statutory authorization for a subsequent prosecution after conviction of one of the two provisions, and that would end the double jeopardy analysis.

471 U.S. 778. Such was the case regarding the CCE: "The language, structure, and legislative history of the Comprehensive Drug Abuse, Prevention and Control Act of 1970 . . . show in the plainest way that Congress intended the CCE provision to be a separate criminal offense which was punishable in addition to, and not as a substitute for, the predicate offenses." Id. at 779.

The Supreme Court in Garrett next "determine[d] whether prosecution for a CCE offense after an earlier prosecution for a predicate offense is constitutional under the Double Jeopardy Clause of the Fifth Amendment," with the "critical inquiry [being] whether a CCE offense is considered the 'same offense' as one or more of its predicate offenses within the meaning of the Double Jeopardy Clause." Id. at 786. The Court then observed:

> Quite obviously the CCE offense is not, in any commonsense or literal meaning of the term, the "same" offense as one of the predicate offenses. The CCE offense requires the jury to find that the defendant committed a predicate offense, and in addition that the predicate offense was part of a continuing series of predicate offenses undertaken by the defendant in concert with five or more other persons, that the defendant occupied the position of an organizer or manager, and that the defendant obtained substantial income or resources from the continuing series of violations.

> In order to properly analyze the successive prosecution issue, [a court] must examine not only the statute which Congress has enacted, but also the charges which form the basis of the Government's prosecution [in the case at issue].

Id.

Much the same has repeatedly been said about RICO. See, United States v. Gonzalez, 921 F.2d 1530 (11th Cir. 1991); United States v. Esposito, 912 F.2d 60 (3d Cir. 1990); United States v. Hawkins, 658 F.2d 279, 287-88 (5th Cir. 1981); United States v. Boylan, 620 F.2d 359, 361 (2d Cir.1980); United States v. Aleman, 609 F.2d 298, 306 (7th Cir. 1979). The District of Columbia

Circuit has explained:

> The language and legislative history of RICO indicates little doubt that Congress, in enacting RICO, sought to allow the separate prosecution and punishment of predicate offenses and a subsequent RICO offense. RICO's statutory language indicates that Congress sought to supplement, rather than supplant, existing crimes and penalties. Section 1961(5) provides that a:
>
>> "pattern of racketeering activity" requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity.
>
> 18 U.S.C. § 1961(5) (emphasis added). This language suggests that Congress envisioned the situation where a defendant is convicted and sentenced for a racketeering act and subsequently charged with a RICO violation based on the prior conviction.
>
> This interpretation of the language of RICO is fully supported by the statute's legislative history:
>
>> It is the purpose of this Act to seek the eradication of organized crime in the United States by strengthening the legal tools in the evidence-gathering process, by establishing new penal prohibitions, and by providing enhanced sanctions and new remedies to deal with the unlawful activities of those engaged in organized crime.

United States v. Grayson, 795 F.2d 278, 282–83 (D.C. Cir. 1986) (internal case citations omitted).

Even before Garrett, the Ninth Circuit observed:

> There is nothing in the RICO statutory scheme which would suggest that Congress intended to preclude separate convictions or consecutive sentences for a RICO offense and the underlying or predicate crimes which make up the racketeering pattern. The racketeering statutes were designed primarily as an additional tool for the prevention of racketeering activity, which consists in part of the commission of a number of other crimes. The Government is not required to make an election between seeking a conviction under RICO, or prosecuting the predicate offenses only. Such a requirement would nullify the intent and effect of the RICO prohibitions.

United States v. Rone, 598 F.2d 564, 571 (9th Cir. 1979).

"As the Court made clear in <u>Garrett</u>, multi-layered conduct offenses, such as CCE and RICO violations, are generically distinct in the double jeopardy arena," <u>United States v. Crosby</u>, 20 F.3d 480, 485 (D.C. Cir. 1994), and so it is here.[6]  The RICO offense "is not, in any commonsense or literal meaning of the term, the 'same' offense as one of the [overt acts]." <u>United States v. Honken</u>, 541 F.3d 1146, 1157 (8th Cir. 2008).  RICO requires association and participation in an enterprise affecting interstate commerce; drug distribution does not.  More specifically as it pertains to this case, Burks' alleged conduct involves the agreement to participate in the affairs of the Gangster Disciples enterprise through a pattern of racketeering activity that involved not merely a single cocaine sale, but also "acts involving murder," witness intimidation, obstruction of justice, and a

---

[6]  In its response brief, the Government discusses at length the test set forth in <u>Blockbuster v. United States</u>, 284 U.S. 299 (1932), but asserts the test may not even be applicable in these circumstances.  The Court agrees.  As the Sixth Circuit has observed, the <u>Blockburger</u> test "comes into play only after other techniques of statutory construction have proved to be inconclusive." <u>Pandelli v. United States</u>, 635 F.2d 533, 536 (6th Cir. 1980).  In other words, "[t]he <u>Blockburger</u> test . . . provides only a canon of construction, not a 'conclusive presumption of law,'" and it "must of course yield to a plainly expressed contrary view on the part of Congress, that is, when the legislative intent is clear from the face of the statute or the legislative history." <u>United States v. Mahdi</u>, 598 F.3d 883, 888 (D.C. Cir. 2010); <u>see also</u> <u>Ohio v. Johnson</u>, 467 U.S. 493, 499 (1984) ("[T]he <u>Blockburger</u> test does not necessarily control the inquiry into the intent of a state legislature.  Even if the crimes are the same under <u>Blockburger</u>, if it is evident that a state legislature intended to authorize cumulative punishments, a court's inquiry is at an end.").

Regardless, <u>Blockburger</u> states that "where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." 284 U.S. at 304.  This is also known as "the same elements test," <u>United States v. Farah</u>, 766 F.3d 599, 606 (6th Cir. 2014), because "the <u>Blockburger</u> test focuses on the proof necessary to prove the statutory elements of each offense, rather than on the actual evidence to be presented at trial." <u>Illinois v. Vitale</u>, 447 U.S. 410, 416 (1980).  The elements required to prove a RICO charge are entirely different from those necessary to establish a distribution of controlled substance charge.  <u>Compare</u> <u>United States v. Nicholson</u>, 716 F. App'x 400, 405 (6th Cir. 2017) ("[T]o sustain these [RICO] convictions, the government must have shown that each defendant agreed (1) to associate with an enterprise that has activities affecting interstate commerce; (2) to participate in the conduct of the enterprise's affairs; and (3) that either he or another conspirator would engage in a pattern of racketeering activity.), <u>with</u> <u>United States v. Colon</u>, 268 F.3d 367, 376 (6th Cir. 2001) ("[A] violation of 21 U.S.C. § 841(a), distribution of cocaine, requires that a defendant: (1) knowingly or intentionally distribute cocaine, and; (2) at the time of such distribution the defendant knew that the substance was cocaine.").

host of other crimes in the Middle District of Tennessee. Said conspiracy allegedly continued over the course of almost 13 years. In contrast, convictions for selling cocaine in a different district on specific days is hardly the same crime charged in the RICO count. This is so, even if the proof would likely be the same regarding one or more of the elements. United States v. Garcia, 259 F. App'x. 747, 750 (6th Cir. 2008); United States v. DeCarlo, 434 F.3d 447, 455-56 (6th Cir. 2006).

Burks's reliance on the United States v. Persico, 620 F. Supp. 836 (S.D.N.Y. 1985), is unpersuasive. While the district court stated for purposes of the overt act requirement that "there must also exist an allegation of either (1) some type of post-plea unlawful conduct, . . . or (2) a post-plea accumulation of evidence sufficient to establish either a second predicate offense or participation in a criminal enterprise," id. at 844, the Second Circuit on appeal explicitly refused to decide whether "subsequent RICO charges can survive double jeopardy objections only if the subsequent indictment alleges conduct that post-dates the plea to the prior charges or if evidence, accumulated subsequent to that plea, establishes either a second predicate offense or participation in a criminal enterprise," United States v. Persico, 774 F.2d 30, 32 (2d Cir. 1985). On a subsequent appeal after remand, the Second Circuit went even further by expressing "serious doubt as to whether evidence of post-plea involvement is necessary to defeat a double jeopardy challenge to RICO convictions based on predicate acts that were the subject of prior guilty pleas." United States v. Persico, 832 F.2d 705, 711 (2d Cir.1987). For its part, the District of Columbia Circuit in Crosby, 20 F.3d at 486, did not "find it dispositive that . . . there [wa]s no allegation that the [defendants] committed, or in light of their incarceration could not have committed, any criminal act since their last predicate prosecution." Instead, "in order to prevail on a RICO charge, the government must prove a sort of antisocial conduct entirely different, in both type and magnitude, from the underlying

offenses." Id.

Similarly, the Seventh Circuit in United States v. O'Connor, 953 F.2d 338, 344 (7th Cir. 1992) refused to require that the Government "allege[] a RICO offense which continues beyond the date of prosecution for previous offenses," noting that "[i]t is not realistic to expect a responsible prosecutor, dealing only with a single predicate offense, necessarily to determine at that time that it is permissible, practical and prudent to proceed under the RICO statute as well." In so doing, the court agreed "with [its] colleagues in the Fourth Circuit that '[w]ithout ample discretion, the government would be forced to either proceed against a defendant for violations that might later serve as predicate acts and foreclose a RICO prosecution in the future or allow predicate acts to go unpunished in anticipation that at some future time the RICO elements would coalesce.'" Id. (quoting United States v. Arnoldt, 947 F.2d 1120, 1128 (4th Cir. 1991)). Given this appellate authority, and in the absence of Sixth Circuit law to the contrary, the Court declines to follow the district court's suggestion in Persico that, in the absence of post-plea conduct, a subsequent RICO prosecution is barred by the double jeopardy clause.

Accordingly, Burks's "Motion to Preclude Evidence of 'Overt Act' Previously Adjudicated in Federal Court" (Doc. No. 592) is **DENIED**.

## VI. Motion to Dismiss for Pre-Indictment Delay

Among the overt acts in the RICO count of the Second Superseding Indictment are the allegations that "on or about January 15, 2006" Darden "shot, and attempted to kill, Person 8 in Clarksville, Tennessee," and that "[o]n or about December 14, 2007" he "shot Person 9," also in Clarksville. Because those events occurred approximately a decade before the return of the Superseding Indictment wherein they were first charged, and some evidence was destroyed in 2010

and 2012,[7] Darden seeks dismissal on due process grounds. Alternatively he requests that the Court provide the jury with a spoliation instruction and/or set a hearing outside the presence of the jury at which time the Government would be required to present proof of Darden's alleged involvement in the shooting.

Turning first to the due process argument, statutes of limitations, "which provide predictable, legislatively enacted limits on prosecutorial delay," are the primary safeguard against "overly stale criminal charges." United States v. Lovasco, 431 U.S. 783, 789 (1977). Nevertheless, a "statute of limitations does not fully define the [defendant's] rights with respect to the events occurring prior to indictment," United States v. Marion, 404 U.S. 307, 324 (1971) and, "[i]n certain cases, the Due Process Clause protects against preindictment delay," Parker v. Burt, 595 F. App'x 595, 601 (6th Cir. 2015).

"In this circuit," however, "dismissal for pre-indictment delay 'is warranted only when the defendant shows substantial prejudice to his right to a fair trial and that the delay was an intentional device by the government to gain a tactical advantage.'" United States v. Schaffer, 586 F.3d 414, 424 (6th Cir. 2009) (quoting United States v. Greene, 737 F.2d 572, 574 (6th Cir. 1984)). This standard "'is nearly insurmountable, especially because proof of actual prejudice is always speculative.'" United States v. Montgomery, 491 F. App'x 683, 691 (6th Cir. 2012) (quoting United States v. Rogers, 118 F.3d 466, 477 n. 10 (6th Cir. 1997)).

Defendant bears the "heavy burden to prove that pre-indictment delay caused actual prejudice." United States v. Wright, 343 F.3d 849, 860 (6th Cir. 2003). "'Bare assertions, without supporting evidence, are not sufficient to demonstrate prejudice.'" Montgomery, 49 F. App'x at 691

---

[7] The destroyed evidence included a bullet fragment and a DVD from the scene of the "Person 8" shooting, and a projectile, seven shell casings, a cell phone and a firearm relating to the "Person 9" shooting.

(quoting United States v. Vaughn, 444 Fed. App'x 875, 879 (6ᵗʰ Cir. 2011)).

At this point, Darden's motion is long on conjecture but short on proof, both as to the prejudice and tactical advantage prongs of the inquiry. He vaguely asserts that the "[b]ullet fragments, phone records, guns, and shell casings could all serve to exonerate [him] or, at least, weaken the government's case," and that he has to "defend himself from decade-old charges with no ability to examine, challenge, or present what could be the most compelling evidence." (Doc. 638 at 6). He does not explain, however, how testing the forensic evidence referred to in Clarksville Police Department ("CPD") reports would exonerate him or weaken the government's case. This is particularly problematic because CPD reports point to him as being a suspect in both shootings, and there is no suggestion that he was not charged because someone else was responsible. Apparently, he was not charged because witnesses were uncooperative, and there was insufficient proof in the eyes of the CPD or Montgomery County prosecutors.

"Similarly, the mere absence of records is not enough to establish actual prejudice." United States v. Corona-Verbera, 509 F.3d 1105, 1113 (9th Cir. 2007). There must be at least some showing that records would have been exculpatory, and that they became lost as a result of delay. United States v. Carruth, 699 F.2d 1017, 1019 (9th Cir. 1983). "Bare assertions," United States v. Vaughn, 444 F. App'x 875, 879 (6th Cir. 2011), vague allegations, United States v. Farias, 836 F.3d 1315, 1325 (11th Cir. 2016), and speculation, United States v. Ford, 328 F. App'x 377, 378 (9th Cir. 2009), will not suffice to show prejudice. See also United States v. Muñoz-Franco, 487 F.3d 25, 58 (1st Cir. 2007) ("With respect to prejudice, a defendant must do more than allege that witnesses' memories had faded or that evidence had been lost that might have been helpful to him."); United States v. Bartlett, 794 F.2d 1285, 1290 (8th Cir. 1986) (collecting cases) ("The defendant also must

relate the substance of the testimony which would be offered by the missing witnesses or the information contained in lost documents in sufficient detail to permit a court to assess accurately whether the information is material to the accused's defense.").

Nor has Darden come close to showing that the delay was the result of the Government seeking to obtain a tactical advantage. He simply argues, with no supporting proof, that federal agents were "well aware, long before [the instant] indictment, that Clarksville had closed the case and destroyed the evidence"; that the U.S. Attorney's Office thus "made the tactical decision to build a RICO case" and add the shootings above as overt acts in the RICO conspiracy charge, "in the hope that otherwise inadequate evidence showing Marcus Darden's involvement would be bolstered by inclusion in a much larger, wide-ranging indictment"; and that the government "has not, and will not, be able to show the discovery of any new evidence related to the shootings between the time the cases were closed by [CPD] and the date of the indictment." (Doc. No. 638 at 2, 6).

In response, the Government represents that federal agents were unaware that the CPD had destroyed evidence in connection with the January 15, 2006, shooting until approximately July 2016, and they were also unaware that the CPD had destroyed evidence in connection with the December 15, 2007, shooting until approximately November 2017. The Government also claims that it developed new evidence in November 2017 regarding Darden's involvement in both shootings. It then superseded its original indictment, on December 14, 2017, and included those shootings as overt acts of racketeering activity in furtherance of the RICO conspiracy.

As for general delay in bringing this case, the Government relies on the same representations that it made regarding a substantially similar Motion (Doc. No. 373) filed by Burks. In a Memorandum and Order denying Burks' Motion, the Court discussed those representations. That

discussion (Doc. No. 472 at 6-7) is incorporated herein by reference.

As pointed out in the prior Order, the Court can rely on representations from the Government in considering the reasons for delay.  See, Rogers, 118 F.3d at 476–77 (citing Lovasco, 431 U.S. at 796 for the proposition that a court may rely upon counsel's representations as to the reason for the delay); United States v. Thomas, 404 F. App'x 958, 961 (6th Cir. 2010) ("Even when the government cites its own court filings rather than offering sworn testimony on the investigative reasons for the delay, we may accept the government's representations about the reason for delay."). As this Court also pointed out in its prior Order, those reasons are more than sufficient to dispel any notion that the Government improperly delayed bringing charges for a tactical advantage. Accordingly, Darden's Motion to Dismiss for Pre-Indictment Delay (Doc. No. 638) is **DENIED WITHOUT PREJUDICE** to reasserting such a motion if he is able to show that the delay substantially prejudiced his defense, and the government intentionally delayed in order to gain a tactical advantage.

Darden's alternative requests for a spoliation instruction and/or a hearing are also **DENIED**. The request for a spoliation instructions is premature, even leaving aside the question of whether bad simple negligence or bad faith must be shown for such an instruction.  See United States v. Braswell, 704 F. App'x 528, 545-47 (6th Cir. 2017) (White J., Concurring) (discussing various standards employed among the circuits and disagreeing "that the issue whether a criminal defendant must show bad-faith conduct by the government to justify even the mildest of spoliation sanctions – a permissive adverse-inference instruction – is settled in this circuit").  All the Court has before it at this time is the Government's representation that (1) it knew nothing about the destruction of the evidence until a decade later, and (2) the evidence was destroyed as a part of the routine purge of

old cases.

Nor is Darden entitled to a hearing that "will give the Court (and the defense) some context in determining whether these shootings bear any relationship to the RICO conspiracy alleged here, or indeed constitute evidence that is inadmissible as character evidence under Rule 404(b) of the Federal Rules of Evidence." (Doc. No. 638 at 7). This amounts to an impermissible attempt to preview how the Government intends to prove its case. See, United States v. Presser, 844 F.2d 1275, 1286 (6th Cir. 1988) ("The Supreme Court has never held that the Constitution creates [the right to know the "tactical strengths and weaknesses" of the government's case] and we do not believe it exists."); United States v. Williams, No. 16-CR-111, 2017 WL 9361072, at *2 (E.D. Wis. Feb. 23, 2017) (observing that, "while a defendant is entitled to know the offense with which he is charged, the government need not disclose all the details of how it will prove its case"); United States v. Johnson, No. 11-20551-40, 2014 WL 12703420, at *1 (E.D. Mich. Mar. 26, 2014) ("While Defendant would no doubt welcome the chance to preview the Government's case and how it intends to present that case to the jury, the court declines to force the Government to provide this roadmap, particularly when Defendant has put forth no compelling reason to do so.").

**VII.** **Motions to Compel Notice of Intent to Offer Evidence of Other Crimes, Wrongs, or Acts**

Burks requests that the Court enter an Order "requiring the Government to provide written notice of what, if any, evidence of other crimes, wrongs, or acts of the Accused it intends to introduce in its case-in-chief or in any reasonably foreseeable rebuttal." (Doc. No. 567 at 1). He notes "that empirical studies, common sense, and review of actual case results lead inescapably to the conclusion that admission of other crimes evidence heavily tilts the scales of justice toward the side of conviction," and that the Sixth Circuit has stated "notice given to the defense regarding

'other crimes' evidence must be sufficiently clear so as 'to permit pretrial resolution of the issue of its admissibility.'" United States v. Barnes, 49 F.3d 1144, 1149 (6th Cir. 1995). By separately filed Motion, "Darden shares the concerns raised by Mr. Burks in his motion to compel notice of any other crimes or bad acts [that] the Government in this decade-long, wide-ranging conspiracy case may seek to introduce evidence of other crimes or bad acts by the defendant." (Doc. No. 645 at 1-2).

Rule 404(b) of the Federal Rules of Evidence provides:

> Evidence of other crimes, wrongs, acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

Fed. R. Evid. 404(b). Thus, "[u]nder Rule 404(b), when the defendant requests notification of the government's intent to introduce other-act evidence, the government must provide such notice in a reasonable form and manner." United States v. Gonzalez, 501 F.3d 630, 637 (6th Cir. 2007).

In response to both Motions, the Government represents that, at present, any "evidence of other crimes, wrongs, or acts" that it expects to introduce at trial are intrinsic to the RICO and drug conspiracy charges and, as such need not be noticed under Rule 404(b). As for true Rule 404(b) evidence that it will use in its case-in-chief, the Government request that it be not be required to provide notice of such evidence until January 15, 2019.

In Count One of the Indictment, Burks and Darden are both charged with being part of a racketeering conspiracy in violation of 18 U.S.C. § 1962(d). In Count Two of the Indictment, they are charged with conspiring to distribute and possessing intent to distribute cocaine, oxycodon, methadone, hydrocodone, and marijuana in violation of 21 U.S.C. § 846. Neither counts require

proof that either Defendant committed specific over acts, or that the charging indictment specify such acts.

"'Unlike a substantive RICO charge, a RICO conspiracy charge does not require proof that the defendant committed any predicate acts' and 'does not even require proof that the defendant 'agreed to commit two predicate acts himself, or even that any overt acts have been committed.'" United States v. Rios, 830 F.3d 403, 424 (6th Cir. 2016) (quoting United States v. Fowler, 535 F.3d 408, 420–21 (6th Cir. 2008)). "'To the contrary, it merely requires proof that the defendant 'intended to further 'an endeavor which, if completed, would satisfy all of the elements of a substantive [RICO] criminal offense [and] it suffices that he adopt the goal of furthering or facilitating the criminal endeavor.'" Id. As a consequence, "[t]here is no requirement that a RICO conspiracy indictment allege any overt act." Id. (citing Salinas v. United States, 522 U.S. 52, 65, 118 S. Ct. 469, 477, 139 L. Ed. 2d 352 (1997)).

Likewise, "the United States Supreme Court has made clear that '21 U.S.C. § 846, the drug conspiracy statute, [does not] require[ ] the Government to prove that a conspirator committed an overt act in furtherance of the conspiracy.'" United States v. Cureton, 661 F. App'x 369, 377 (6th Cir. 2016) (citing United States v. Shabani, 513 U.S. 10, 11, 115 S.Ct. 382, 130 L.Ed.2d 225 (1994)). This is "[b]ecause the essence of the crime of conspiracy is agreement," and "the government must prove that each member of a conspiracy agreed to participate in what he knew to be a collective venture directed toward a common goal." United States v. Patel, 579 F. App'x 449, 461 (6th Cir. 2014).

Notwithstanding the foregoing, Darden argues that "[a]dvance notice of the Government's intent to introduce such evidence comports with Federal Rule of Evidence 404(b)[.]" (Doc. No. 645 at 2). However, that Rule deals with extrinsic, not intrinsic evidence.

"Extrinsic acts include other crimes or wrongs which 'occurred at different times and under different circumstances from the offense charged,' while intrinsic acts 'are those that are part of a single criminal episode.'" United States v. Knox, 17 F. App'x 353, 357 (6th Cir. 2001) (quoting United States v. Barnes, 49 F.3d 1144, 1149 (6th Cir. 1995). "Rule 404(b) is not implicated when the other crimes or wrongs evidence is 'intrinsic,' that is, 'part of a continuing pattern of illegal activity.'" United States v. Long, 450 F. App'x 457, 462 (6th Cir. 2011) (quoting United States v. Gonzalez, 501 F.3d 630, 639 (6th Cir. 2007)). This includes RICO conspiracy counts. United States v. Gills, 702 F. App'x 367, 383 (6th Cir. 2017); United States v. Garland, 320 F. App'x 295, 305 (6th Cir. 2008).

Even though the Rule 404(b) analysis is not necessary for determining the admissibility of intrinsic evidence in a RICO case, and assuming that the Government has properly viewed whatever crimes or wrongs evidence it possesses is truly intrinsic, the Court is still concerned about notice to Defendants. "Notice of issues to be resolved by the adversary process is a fundamental characteristic of fair procedure," and "[i]f notice is not given, and the adversary process is not permitted to function properly, there is an increased chance of error." Lankford v. Idaho, 500 U.S. 110, 127 (1991). This can be of particular concern in the context of a RICO case. As the Second Circuit observed in the context of reversing a RICO count where the alleged extortion offenses were "not limited to" the four extortion counts listed in the Indictment:

With the wide latitude accorded the prosecution to frame a charge that a defendant has "conspired" to promote the affairs of an "enterprise" through a "pattern of racketeering activity" comes an obligation to particularize the nature of the charge to a degree that might not be necessary in the prosecution of crimes of more limited scope. In this case the indictment charges a RICO conspiracy of seven years' duration carried out through various extortion offenses. The indictment puts Davidoff on notice that he will be obliged to defend against extortionate schemes directed at one company, AEI, and companies associated with it in contemplation of a merger. At trial Davidoff is then confronted with evidence of extortions aimed at entirely different companies. Though we agree with the Government that even in a RICO case it is not obliged to disclose before trial all of its evidence, we believe the trial judge exceeded his discretion in this RICO prosecution by denying a bill of particulars identifying at least the victims of discrete extortionate schemes that the prosecution intended to prove. . . We do not mean to imply that even in a RICO case the prosecution must always disclose in advance of trial every act it will prove that may violate some criminal statute. But here it is simply unrealistic to think that a defendant preparing to meet charges of extorting funds from one company had a fair opportunity to defend against allegations of extortions against unrelated companies, allegations not made prior to trial.

United States v. Davidoff, 845 F.2d 1151, 1154 (2d Cir. 1988).[8]

Here, the RICO count encompasses the period from 2005 until the return of the Indictment in 2017, and includes 76 overt acts running the gamut from gathering to discuss the affair of the Gangster Disciples, to retaliation, to murder, "among others." (Doc. No. 380 at 11). The last thing Defendants need is for the Government to offer proof at trial of still other violent acts or crimes without advanced notice.

The "well-established rule" is "that the overt act element of a conspiracy charge may be satisfied by an overt act that is not specified in the indictment," but this is only true "so long as there is no prejudice to the defendant." Rios, 830 F.3d at 424 (citing United States v. Salmonese, 352 F.3d 608, 619 (2d Cir. 2003)). While the Government has provided Defendants with what it

---

[8] The Court recognizes that Davidoff was decided before the 1991 Amendments to Rule 404(b) which "does not extend to evidence of acts which are 'intrinsic; to the charged offense[.]" 1991 Advisory Committee note to Rule 404(b). However, those Amendments do not affect the fundamental right to due process and notice.

characterizes as "voluminous discovery" (which some Defendants have quantified be close to a terabyte of information), the possibility exists that counsel, who obviously will be focusing on what has actually been alleged, may lose the forest for the trees. See, United States v. Bortnovsky, 820 F.2d 572, 575 (2d Cir. 1987) ("commend[ing] the Government for cooperating in the turning over of documents prior to trial," but "not looking with favor on the manner in which the Government conducted the prosecution" where "key events w[e]re shrouded in mystery at the commencement" of the trial, and noting the "Government did not fulfill its obligation merely by providing mountains of documents to defense counsel who were left unguided"); United States v. McQuarrie, No. 16-CR-20499, 2018 WL 372702, at *5-6 (E.D. Mich. Jan. 11, 2018) (noting that "[b]ecause the Constitution requires that the defendant be presumed innocent, the defendant should also be presumed ignorant of the factual basis for the charges," and that a "defendant may be denied notice of the charges both when information is actively concealed and when the relevant information is provided in a manner reminiscent of the proverbial needle in the haystack"). Therefore, to ensure fundamental fairness and due process, and to eliminate a potential delay in the trial or the possibility of a mistrial because one or more Defendants is blind-sided by alleged crimes that can be easily disclosed in advance of trial, the Government will be required not only to disclose other "crime, wrongs, or other acts" within the meaning of Rule 404(b), but also other crime or violent acts in the form of "overt acts" under the RICO count that the Government intends to utilize in its case in chief.

This leave the question of when such disclosures should be required. The Government's request for a January 15, 2019 deadline is entirely reasonable because it is a month and a half before trial. See e.g., United States v. Northington, No. CRIM. A. 07-550-05, 2013 WL 420296, at *6 (E.D. Pa. Feb. 4, 2013) (finding notice provided "over a month before trial" sufficient); United

States v. Giffen, 379 F. Supp. 2d 337, 345 (S.D.N.Y. 2004) (discussing reasonableness standard and requiring Government to provide Rule 404(b) notice 45 days before trial); United States v. Falkowitz, 214 F. Supp. 2d 365, 393 (S.D.N.Y. 2002) (collecting cases for the proposition that two to three weeks before trial is sufficient notice). Accordingly, Burks' and Darden's Motions to Compel Notice of Intent to Offer Evidence of Other Crimes, Wrongs, or Acts (Doc. Nos. 567 & 645) are **GRANTED** to the extent that the Government shall provided *all* Defendants with Rule 404(b) notice on or before January 15, 2019. Also by that date, the Government shall provided Defendants with notice of other crimes or violent acts that constitute "overt acts" for purposes of Count One alleging a RICO conspiracy. This notice is limited to evidence that the Government intends to rely on during its case-in-chief.

### VIII. Motions for Bill of Particulars

Darden, Burks, Xavier Jenkins, and James Luke have each filed Motions for Bill of Particulars (Doc. Nos. 591, 595, 599, and 700). Prior to addressing those Motions, the Court sets forth the applicable standard.

### A. Standard of Review

A district court, in its discretion, United States v. Robinson, 390 F.3d 853, 867 (6th Cir. 2004), "may direct the government to file a bill of particulars." Fed. R. Crim. P. 7(f). "The function of a bill of particulars is to 'to minimize surprise and assist [the] defendant in obtaining the information needed to prepare a defense and to preclude a second prosecution for the same crimes." United States v. Crayton, 357 F.3d 560, 568 (6th Cir. 2004) (quoting United States v. Salisbury, 983 F.2d 1369, 1375 (6th Cir. 1993)). "A bill of particulars 'is not meant as a tool for the defense to obtain detailed disclosure of all evidence held by the government before trial.'" Id. Instead, "the test

in ruling on a motion for a bill of particulars is whether providing such details is necessary to the preparation of the defense and avoidance of prejudicial surprise." United States v. Musick, 291 F. App'x 706, 724 (6th Cir. 2008).

**B.  Motion for Bill of Particulars – Count One**

Among the overt acts alleged in Count One is the following:

a. On or about January 15, 2006, in or near Clarksville, Tennessee, **[1] DARDEN** and **[11] WHITLOCK** planned to shoot Person 8 for disrespecting the Gangster Disciples.

b. On or about January 15, 2006, **[1] DARDEN** shot, and attempted to kill, Person 8 in Clarksville, Tennessee.

l. On or about December 15, 2007, **[1] DARDEN** shot Person 9 in Clarksville, Tennessee.

jjj. In or about March 2014, **[1] DARDEN** and other Gangster Disciples gathered in Nashville, Tennessee, to administer a "smashing" or "violation" of Person 1.

(Doc. No. 380 at 11, 19).  Darden has filed a Motion for Bill of Particulars (Doc. No. 595) requesting the "exact" date, time, place, and name of the alleged victim for the foregoing overt acts.

"[A]n indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." Hamling v. United States, 418 U.S. 87, 117 (1974).  Count One meets those requirements, even after considering that the principles surrounding a bill of particulars "must be applied with some care when the Government charges criminal offenses under statutes as broad as RICO."   Davidoff, 845 F.2d at 1154.

Leaving aside the voluminous discovery that has been provided and likely answers many of the questions posed by Darden, a court is not required to grant a Bill of Particulars seeking the exact

date, time, and location of overt acts.  See United States v. Chen, 378 F.3d 151, 163 (2d Cir. 2004)

(stating that district court did not abuse its discretion in denying "bill of particulars specifying the

exact time and place of each alleged act associated with each offense identified in the indictment");

United States v. Crule, No. 15-CR-143-V, 2017 WL 5166565, at *2 (W.D.N.Y. Nov. 8, 2017);

(rejecting request for details of the charged conspiracy such as "the precise date" defendant became

a member, and the location of cocaine that was found); United States v. Turner, No. 14-20019, 2015

WL 687313, at *3 (E.D. Mich. Feb. 18, 2015) (rejecting motion for bill of particulars where

defendant requested "the exact date and times and specific place on which each specific alleged

offense occurred"); United States v. Agard, 531 F. Supp.2d 1072 (D. N.D. 2008) ("As a general rule,

the accused is not entitled to a bill of particulars which provides the exact date of the commission

of the alleged crimes where time is not an essential element of the crime.").  Put simply,

"[e]videntiary details such as the who, what, when, where, and why of the crimes alleged fall within

the scope of discovery and do not warrant a bill of particulars." United States v. Galecki, No.

215CR00285APGPAL, 2018 WL 2390062, at *3 (D. Nev. May 24, 2018) (citing United States v.

Ellis, 121 F. Supp. 3d 927, 941 (N.D. Cal. 2015)).

Furthermore,  the  "Persons" listed in the excerpted portions of Count One may well be

Government witnesses.  To the extent they are, disclosure via a bill of particulars is not appropriate.

Musick, 291 F. App'x at 724.  Besides, the Magistrate Judge has issued an Order requiring the

Government to provide its list of witnesses at least two weeks before trial.[9]

---

[9] That ruling is challenged by Burks and in one of the motions that will be set for a hearing.

To the extent they are not witnesses, significant concerns have been raised about victims' safety in this case. United States, v. Lorenzana-Cordon, 130 F. Supp. 3d 172, 176 (D.D.C. 2015) (rejecting a bill of particulars where legitimate concerns were raised about safety); United States v. Lanier, No. 3:11-CR-00098, 2012 WL 5921148, at *5 (M.D. Tenn. Nov. 26, 2012) (same); United States v. Gotti, No. 02–CR–743 (S–4)(RCC), 2004 WL 32858, at *9 (S.D.N.Y. Jan. 6, 2004) (same). Furthermore, a bill of particulars is required only where the "charges of an indictment are so general that they do not advise the defendant of the specific acts of which he is accused." Chen, 378 F.3d at 163. Though the Court is not privy to the discovery that has been provided, the limited discovery that has been placed in the record suggests that Darden has learned far more about the Government's version of the events than he suggests. For example, the CPD report dated January 15, 2006 indicates that an aggravated assault occurred around 1:30 a.m. at 837 Richardson St. in Clarksville, Tennessee, and that this was allegedly linked to an incident that happened the night before at the Club Salee. (Doc. No. 638-1 at 1-3). A second CPD report indicates that a another aggravated assault occurred around 3:00 a.m. on December 15, 2007, with the accompanying ATF report indicating that this occurred at the Smooth Cats nightclub in Clarksville. (Doc. No. 638-2 at 1-4; 638-1 at 1)).

Darden's Motion for a Bill of Particulars (Doc. No. 595) is **DENIED.** To the extent Darden truly does not know the identify of Persons 1, 8 and 9, he can raise the issue at the pretrial conference.

## C. Motion for Bill of Particulars – Count Two

Burks and Luke have filed Motions for a Bill of Particulars (Doc. Nos. 591 and 700) in relation to Count Two. Burks claims that Count "is uncommonly vague," and "[i]t is hard to

imagine a case where a bill of particulars is more necessary." (Doc. No. 591 at 3). He "specifically requests this Court to order the Government to provide the specific time, place and locations of overt acts allegedly committed by [him] comprising the alleged conspiracy alleged in Count Two." (Id. at 4-5). Similarly, Luke argues that "Count Two of the Indictment is extremely vague." (Doc. No. 700 at 2). He asks to "be provided with a list of and brief summary of all overt acts the government alleges defendant committed in furtherance of the drug conspiracy charged in Count Two of the Indictment." (Id. at 6).

Count Two reads:

Beginning on a date unknown but at least as of in or about 2005, and continuing through the return date of this Indictment [April 19, 2018], in the Middle District of Tennessee and elsewhere, the defendants, [1] MARCUS TERMAINE DARDEN, [2] MAURICE DUNCAN BURKS, [4] LAMAR ANDRE WARFIELD, [5] DERRICK LAMAR KILGORE, [6] ELANCE JUSTIN LUCAS, [7] DECARLOS TITINGTON, [8] LAWRENCE MITCHELL, [9] LORENZO CORTEZ BROWN, [11] REX ANDREW WHITLOCK, and [12] JAMES ANDERSON LUKE, did combine, conspire, confederate, and agree, together and with others known and unknown to the Grand Jury, to knowingly and intentionally distribute and possess with intent to distribute five kilograms or more of cocaine hydrochloride; 280 grams or more of cocaine base, that is, crack cocaine; oxycodone; methadone; and hydrocodone, all Schedule II controlled substances; and marijuana, a Schedule I controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

All in violation of Title 21, United States Code, Section 846.

(Doc. 380 at 21-22). "To prove a defendant guilty of conspiracy to distribute and possess with intent to distribute controlled substances, the government has to show '(1) an agreement to violate drug laws (2) knowledge and intent to join the conspiracy; and (3) participation in the conspiracy.'" United States v. Warman, 578 F.3d 320, 332–33 (6th Cir. 2009) (quoting United States v. Martinez, 430 F.3d 317, 330 (6th Cir. 2005)).

No doubt the length of the alleged conspiracy is long – twelve years – but that is not unheard of. See, United States v. Calabrese, 490 F.3d 575, 580 (7th Cir. 2007) (declining to dismiss RICO conspiracy counts alleging one conspiracy that lasted 4 decades and another that lasted 11 years); United States v. Howard, No. CRIM.A. 12-01, 2015 WL 6669162, at *5 (E.D. La. Nov. 2, 2015) (alleging a drug conspiracy lasting at least 16 years); Thompson v. United States, 719 F. Supp. 2d 977, 978 (N.D. Ill. 2010) (drug conspiracy lasting 15 years); United States v. Korbe, No. 02:09-CR-0005, 2010 WL 2404384, at *4 (W.D. Pa. June 10, 2010) (alleging an 18 year drug conspiracy). And, while the precise date of the commencement of the alleged conspiracy is not specified, "an indictment that is open-ended as to beginning dates but not end dates suffices." United States v. Vassar, 346 F. App'x 17, 22 (6th Cir. 2009)

Nor is Count Two unconstitutionally vague. Consider, by comparison, the allegations involving a drug conspiracy in Korbe where Count Five alleged:

> From in or around 1990, and continuing thereafter to on or about November 19, 2008, in the Western District of Pennsylvania, the defendant CHRISTINA MARIE KORBE, did knowingly, intentionally and unlawfully conspire with persons both known and unknown to the grand jury, to distribute and possess with the intent to distribute five hundred (500) grams or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance, contrary to the provisions of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(B)(ii).
>
> In violation of Title 21, United States Code, Section 846.

Korbe, 2010 WL 2404384, at *4. While Count Five "identifie[d] the general geographic location and the elements of the offense sufficiently to fairly inform Defendant of the Charge and to 'protect against double jeopardy because of an inadequately described offense," the court nevertheless found a Bill of Particulars appropriate because of the absence of any indication of any acts taken or who was alleged to be in the conspiracy.

The Indictment in this case does not contain the same infirmities. Not only does Count Two (1) identify the specific types of controlled substances alleged to have been trafficked by Burks, Luke and their co-conspirators – cocaine, crack cocaine, oxycodone, methadone, hydrocodone, and marijuana; the quantities of cocaine and crack cocaine trafficked – five kilograms or more of cocaine and 280 grams or more of crack; the location – the Middle District of Tennessee and elsewhere; and the duration of the alleged conspiracy – from on or about 2005 until the return date of the initial Indictment, (2) it also expressly identifies certain co-conspirators with whom Burks and Luke are alleged to have engaged in the drug trafficking conspiracy -- Marcus Darden, Lamar Warfield, Derrick Kilgore, Elance Lucas, DeCarlos Titington, Lawrence Mitchell, Lorenzo Brown, Rex Whitlock, and others.

Furthermore, and even though as already noted overt acts need not be alleged or proven in a Section 846 conspiracy, <u>Shabani</u>, 513 U.S at 11, the Second Superseding Indictment[10] contains a laundry list of alleged acts by Defendants, many of which relate to drug trafficking. This includes, but is not limited to: (1) Lamar Warfield's possession with intent to distribute, and distribution of crack cocaine from in or about 2007 to 2014 in Clarksville, Tennessee, and elsewhere ; (2) Lawrence Mitchell's possession with intent to distribute, and distribution of crack cocaine from in or about 2007 and 2014 in Clarksville, Tennessee, and elsewhere; (3) DeCarlos Titington's (a) possession with intent to distribute, and distribution of cocaine and crack cocaine from in or about 2007 to 2015 in Clarksville, Tennessee, and elsewhere, (b) distribution, and possession with intent to distribute crack cocaine in Guthrie, Tennessee, on or about February 12, 2014, (c) sale of crack cocaine in

---

[10] A defendant is not entitled to a bill of particulars with respect to information which is already available through other sources <u>United States v. Paulino</u>, 935 F.2d 739, 750 (6th Cir. 1991). This includes information contained in other counts. <u>United States v. Tipton</u>, 90 F.3d 861, 884 (4th Cir. 1996).

Guthrie, Tennessee, on or about February 20, 2014, and (d) possession with intent to distribute cocaine in Clarksville, Tennessee, on or about February 15, 2015; (4) Rex Whitlock's possession with intent to distribute eight kilograms of cocaine in Georgia on or about August 22, 2008; (4) Marcus Darden's (a) distribution, and possession with intent to distribute cocaine in Clarksville, Tennessee, within one thousand feet of property comprising a public university, namely, Austin Peay State University, on or about January 24, 2014, (b) distribution, and possession with intent to distribute cocaine in Clarksville, Tennessee, on or about April 4, 2014, and © distribution, and possession with intent to distribute 28 grams or more of crack cocaine in Clarksville, Tennessee, on or about June 17, 2014; (5) Lorenzo Brown's (a) distribution, and possession with intent to distribute crack cocaine in Murfreesboro, Tennessee, within one thousand feet of the real property comprising a private elementary school, namely, Saint Rose of Lima Catholic School on or about February 20, 2014, March 11, 2014 and April 1, 2018, (b) distribution, and possession with intent to distribute 28 grams or more of crack cocaine in Murfreesboro, Tennessee, on or about May 8, 2014; and (6) Derrick Kilgore's possession with intent to distribute cocaine in Clarksville, Tennessee, on or about June 18, 2017.

Count Two is more than sufficient to serve its purposes, i.e. provide sufficient information to prepare a defense and plead double jeopardy as a bar to prosecution. On this latter point, both Burks and Luke argue the discovery that has been provided is insufficient to determine whether the double jeopardy clause serves as a bar to prosecution. Burks does so in a separately filed Motion to Dismiss that will be set for an evidentiary hearing, while Luke raises the argument in his Motion for Bill of Particulars.

Luke's double jeopardy argument is underdeveloped. Luke asserts that "he was charged in state court in Montgomery County, Tennessee with some of the conduct referenced in the current federal indictments" for which he was imprisoned from December 28, 2012 through June 13, 2013, after which he successfully completed a one-year drug and alcohol treatment program. (Doc. No. 700 at 1-2). Without more, this does not suggest possible punishment twice for the same crime because the alleged crime here is an agreement to distribute drugs for a lengthy period of time.[11] Moreover, "[u]nder what is known as the dual-sovereignty doctrine, a single act gives rise to distinct offenses—and thus may subject a person to successive prosecutions—if it violates the laws of separate sovereigns." Puerto Rico v. Sanchez Valle, 136 S.Ct. 1863, 1867 (2016). "Therefore, '[a] prosecution in state court under state law, including a criminal or otherwise punitive proceeding, followed by a prosecution in federal court under federal law, does not violate the constitutional prohibition on double jeopardy.'" Moorer v. United States, No. 16-4721, 2018 WL 2979900, at *2 (6th Cir. Apr. 30, 2018) (quoting United States v. Holmes, 111 F.3d 463, 467 (6th Cir. 1997)).[12]

Luke also points to another federal indictment that was returned against him in United States v. Trotter, et al., No. 3-14-cr000172 (M.D. Tenn. 2014), that is pending before Judge Richardson. There, Luke is charged with two others (neither of whom is an alleged co-conspirator in this case) with conspiracy to distribute crack cocaine within 1,000 feet of a public elementary school during the period of January 24, 2012 through March 9, 2012. This short-lived conspiracy is nothing like

---

[11] In his Motion, Luke also seems to suggest that he withdrew from the conspiracy after his state court conviction. This, however, is an affirmative defense that must be proven by him at trial. Smith v. United States, 568 U.S. 106, 110, 133 S. Ct. 714, 719, 184 L. Ed. 2d 570 (2013); United States v. Payne, 962 F.2d 1228, 1234 (6th Cir. 1992).

[12] The Court recognizes that the "separate sovereign" doctrine is currently before the United States Supreme Court in Gamble v. United States, 138 S.Ct. 2707 (2018). Until such time as the doctrine is abrogated, however, the Court follows this long-established precedent.

that alleged here.  Besides, that case is pending: he has not either been acquitted or convicted of that

conduct.

Accordingly, the Motions for a Bill of Particulars (Doc. Nos. 591 & 700) as to Count Two

are **DENIED**.

### D.  Bill of Particulars – Count Twelve

Jenkins has filed a Motion for Bill of Particulars (Doc. No. 599) in relation to Count Twelve

which alleges violent crimes in aid of racketeering ("VICAR").  Count Twelve reads:

COUNT TWELVE

(Assault Resulting in Serious Bodily Injury in Aid of Racketeering as to M.W.)

THE GRAND JURY FURTHER CHARGES:

1. The allegations contained in paragraphs 1 through 5 of Count One and paragraphs 2 and 3 of Count Three of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

2. On or about November 3, 2012, in the Middle District of Tennessee, [1] MARCUS TERMAINE DARDEN, [3] BRANDON DURELL HARDISON, and [10] XAVIER RAPHAEL JENKINS, for the purpose of maintaining and increasing position in the Gangster Disciples, an enterprise engaged in racketeering activity, did knowingly assault M.W., resulting in serious bodily injury to M.W., and did aid and abet in the assault of M.W., resulting in serious bodily injury to M.W., in violation of Tennessee Code Annotated, Sections 39-13-101, 39-13-102, and 39-11-402.

In violation of Title 18, United States Code, Sections 1959(a)(3) and 2.

(Doc. No. 380 at 28).

Jenkins requests a bill of particulars identifying the bodily injury M.W. allegedly suffered.

He argues:

Count Twelve alleges that Mr. Jenkins "did knowingly assault M.W., resulting in serious bodily injury to M.W." But M.W. was allegedly murdered by co-defendant Burks.  (See, Count Eleven).  And in discussions with the prosecutor, the Government does not allege that Jenkins shot M.W. Yet, Count Twelve alleges that M.W. suffered serious bodily injury.  So what serious bodily injury did M.W. suffer?

> The gunshot wound?  Yet the Government does not allege that Jenkins fired the gun, only that he assaulted M.W.  So what bodily injury did M.W. suffer as a result of Jenkins' alleged assault other than the fatal gunshot wound?

(Doc. No. 599 at 4).

Despite the seeming simplicity of the request, *i.e.* disclosure of the injury, the Government opposes Jenkins' Motion by pointing out he has received extensive discovery, including copies of the medical examiner's report that detail M.W.'s injuries.  True enough, but the coroner's examination had to have occurred after  M.W. was allegedly shot and killed by Burks (who is not named in the VICAR count).  While a "bill of particulars is not intended as 'a means of learning the government's evidence and theories,'" Musick, 291 F. App'x at 724, as the Government asserts, a bill of particulars can be utilized to clarify any potential confusion.  See United States v. Napier, 787 F.3d 333, 350 (6th Cir. 2015); United States v. Perry, 757 F.3d 166, 172 (4th Cir. 2014).

Accordingly, Jenkins' Motion for Bill of Particulars (Doc. No. 599) in relation to Count Twelve is **GRANTED**, and the Government shall disclose to defendant the "serious bodily injury" M.W. is alleged to have suffered as a result of the assault on November 3, 2012.  Said information shall be disclosed by January 15, 2019.

## IX.  Motions to Sever

 Motions to Sever have been filed by Burks (Doc. No. 566), Hardison (Doc. No. 642), and Luke (Doc. No. 698).  In response to each of these motions, the Government acknowledges that proper joinder under Rule 8 is not raised by any of the Defendants, but "nevertheless elect[s] to demonstrate that joinder is proper, as the propriety of that joinder helps explain why severance would be inappropriate here."  (Doc. Nos. 672 at 3, n.1; 722 at 3 n.1; 739 at 3 n.1).  Because improper joinder under Rule 8 is not the basis for the Motions, the Court finds it unnecessary to follow suit, other than to note that "[i[f the requirements of Rule 8 are not met, 'the district court has

no discretion on the question of severance.'" United States v. Cody, 498 F.3d 582, 586 (6th Cir. 2007) (citation omitted). That is not the case here given the overarching conspiracy alleged in Count One and the substantive charges that are alleged to show participation in that conspiracy.

Turning to what is argued, Rule 14 provides:

> If the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires.

Fed. R. Crim. P. 14(a). Whether to grant a severance lies in the sound discretion of the Court, and abuse occurs only where there is a "strong showing of prejudice," that is, "that joinder would compromise a specific trial right or prevent the jury from making a reliable judgment about guilt or innocence." United States v. Tran, 433 F.3d 472, 478 (6th Cir. 2006).

Burks identifies "numerous problems inherent in the notion of trying all of the co-defendants together in the instant case." (Doc. No. 566 at 1). These include (1) impairment of the right to confront witnesses because some co-defendant may have implicated themselves and others in crimes; (2) the "unquestionable difficulty" the jurors will have in remembering which facts apply to which defendant throughout the course of a lengthy trial, particularly because defendants "are linked not just by the fact that they are charged together, but also shared characteristics, such as race, age, and background"; and (3) the possibility of mutually antagonistic defenses. (Id. at 2-4).

Hardison argues that the jury will be "inundated with proof of multiple acts of violence and drug trafficking that occurred at times when [he] was incarcerated," (Doc. No. 642 at 6), and the only way to counter those allegations would be to point out that he was in custody from April 2004 until May 2011, and again from May 2013 to June 2015. This would require him to present evidence thereby "depriv[ing] him of the fundamental right to require the Government to carry its

burden of proof." (Id.). He also raises the additional concern expressed by Burks about prejudicial spillover.

Luke, too, raises many of the same concerns expressed by Burks. Additionally, Luke, who is not charged with murder, argues that "[e]vidence of murder, attempted murder, and other heinous crimes will be admitted in a joint trial that would not be admissible if [he] was tried alone, and **this circumstance alone requires severance**." (Doc. No. 698 at 3) (emphasis in original).[13]

The general problems inherent in joint trial identified by Defendants are legitimate, but they do not mandate severance. For example, in Zafiro v. United States, 506 U.S. 534 (1993), the Supreme Court refused to adopt a "bright line rule" requiring severance under Rule 14, even where irreconcilable or mutually antagonistic defense are raised. The Court wrote:

> Mutually antagonistic defenses are not prejudicial per se. Moreover, Rule 14 does not require severance even if prejudice is shown; rather, it leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion.
>
> We believe that, when defendants properly have been joined under Rule 8(b), a district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence. Such a risk might occur when evidence that the jury should not consider against a defendant and that would not be admissible if a defendant were tried alone is admitted against a codefendant. For example, evidence of a codefendant's wrongdoing in some circumstances erroneously could lead a jury to conclude that a defendant was guilty.
>
> When many defendants are tried together in a complex case and they have markedly different degrees of culpability, this risk of prejudice is heightened. . . . Evidence that is probative of a defendant's guilt but technically admissible only against a codefendant also might present a risk of prejudice. . . . Conversely, a defendant might suffer prejudice if essential exculpatory evidence that would be available to a defendant tried alone were unavailable in a joint trial. . . . The risk of prejudice will vary with the facts in each case, and district courts may find prejudice in situations

---

[13] Though deemed to be worthy of emphasis by Luke, no authority is given for this proposition, and the Court is aware of none.

not discussed here. When the risk of prejudice is high, a district court is more likely to determine that separate trials are necessary, but . . . less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice.

Id. at 538–39 (internal citations omitted).

This is indeed a complex case. The Court has already made that finding for purposes of 18 U.S.C. § 3161(h)(7)(B)(ii). (Doc. No. 239 at 2). But so are most RICO cases. See, United States v. Manzella, 782 F.2d 533, 540 (5th Cir. 1986) (upholding denial of severance even though "[a]s in most RICO cases, the evidence here is both massive and complex"); United States v. Eldridge, No. 09-CR-329, 2014 WL 4640848, at *4 (W.D.N.Y. Sept. 16, 2014) (noting that "all cases involving RICO, RICO conspiracy and murders are complex").

While this Court has exercised its discretion in severing a complex criminal case in the past, see, United States v. Johnson, 256 F. Supp.3d 763, 769 (M.D. Tenn. 2017), Defendants have not shown how this case can be cleanly severed, such that potential prejudice can be avoided and efficiency would be served, particularly given the overarching RICO conspiracy alleged in Count One. Moreover, none of the Defendants who have filed Motions to Sever are really in a position to complain about prejudicial spillover or limited culpability *vis-a-vis* the other Defendants.

Hardison is alleged to be a member of the Gangster Disciples who committed numerous overt acts in furtherance of that criminal organization. Among other things, he is alleged to have traveled with others to Clarksville to locate D.S., and once located, confronted, shot, and killed him over a drug debt. At the same time he allegedly killed D.S.'s girlfriend, A.W. Thereafter, Hardison is said to have given the murder weapon to another Gangster Disciples member for disposal, and also spoken to several Gangster Disciples about the murders. It is further alleged that Hardison talked with several co-Defendants and other gang members about retaliating against rival Bloods gang members and, shortly thereafter confronted and assaulted M.W., a Bloods gang member, in C-

Ray's Social Club.  Hardison is also charged with an array of substantive offenses based upon those overt acts including VICAR murder of D.S. (Count Five), and A.W. (Count Seven) in violation of Title 18, United States Code, Section 1959(a)(1); Causing Death Through the Use of a Firearm in relation to D.S. (Count Six) and A.W. (Count Eight), in violation of Title 18, United States Code, Section 924(j); Tampering with a Witness, Victim, or Informant by Killing or Attempting to Kill A.W., in violation of Title 18, United States Code, Section 1512(a)(1)(c)(Count Nine); and Assault Resulting in Serious Bodily Injury in Aid of Racketeering in relation to M.W., in violation of Title 18, United States Code, Sections 1959(a)(3) and 2 (Count Twelve).

Burks is also alleged to have committed murder, along with drug trafficking crimes.  In the RICO count, Burks is identified as a Gangster Disciples member who attended membership meetings, and advanced the goals of the organization by (1) by possessing with intent to distribute and distributing cocaine in Hopkinsville, Kentucky on February 4, 2010, February 26, 2010,  and December 17, 2010; (2) meeting with other Gangster Disciples in or near Clarksville on or about September 23, 2012 to discuss possible retaliation against members of the Bloods gang for the murder of S.F., a Gangster Disciples' associate; (3) communicating with other Gangster Disciples on or about November 3, 2012, about retaliating against members of the Bloods gang; and (4) shooting and killing M.W. inside C-Ray's, on or about November 3, 2012.  He is also charged in Count Two with drug conspiracy, and in Counts Ten, Eleven, Thirteen, and Fourteen, for offenses arising from the murder of M.W., including Unlawful Possession of a Firearm by a Convicted Felon, in violation of 18 U.S.C. § 922(g)(1); Murder in Aid of Racketeering, in violation of 18 U.S.C. § 1959(a)(1); Using, Carrying, Brandishing, and Discharging a Firearm During and in Relation to, and Possessing, Brandishing, and Discharging a Firearm in Furtherance of, a Crime of Violence, in violation of 18 U.S.C. § 924(c); and Causing Death through the Use of a Firearm, in violation of 18

U.S.C. § 924(j). Three others are charged with offenses relating to Burks's murder of M.W. as well.

If the allegations of the Second Superseding Indictment are to be believed, Luke is not an innocent bystander either. In his Motion, Luke is quick to point out that, unlike Hardison and Burks, he is not charged with murder. However, Luke, like the other Defendants, is allegedly a member of the Gangsters Disciples and is charged with RICO conspiracy. Among the over acts attributed to him are that: (1) he possessed with intent to distribute and distributed cocaine, crack cocaine, and other controlled substances, in Clarksville and elsewhere between 2009 and 2012; (2) he and other members of the Gangster Disciples shot at, and attempted to kill, Person 10, a member of the Vice Lords gang, in Clarksville on or about June 24, 2009; (3) he and other members of the criminal organization shot at, and attempted to kill, members of the Vice Lords gang, in Clarksville on September 13, 2009, during which Person 11 was struck by bullets; and (4) he shot at, and attempted to kill, Person 12, in or around Clarksville on or about April 12, 2012. Luke is also charged in the conspiracy to distribute cocaine and other controlled substances alleged in Count Two.

Were the Court to grant the motions to sever, this would require a minimum of four trials. In one, trial would be held against Hardison on Counts One, Five, Six, Seven, Eight, Nine, and Twelve. A second trial involving Burks would require trial of Count One again, plus, Counts Two, Ten, Eleven, Thirteen, and Fourteen. Yet a third trial, against would involve trying Count Ones and Two again, this time against Luke. Still a fourth trial against the remaining seven Defendants would involving trying the RICO count for the fourth time, the drug conspiracy count for the third time, plus all of the other substantive counts in which Hardison, Burks and Luke are not named.

Hardison argues that, because he in jail for a long portion of the life of the alleged conspiracy, he would be subject to prejudicial spillover. This would include "proof regarding the murder of J.H. that occurred in 2007, multiple counts of drug trafficking crimes that occurred 2014

and several instances alleging the attempted murders of multiple individuals in 2014, all of which occurred during times when [he] was incarcerated." (Doc. No. 642 at 5). He argues the only way to counter this would be to provide proof of his incarceration, which would not only be highly prejudicial, but also require him to present evidence in violation of his right to remain silent.

The Court recognizes that a joint trial in which all Defendant are tried could result in some spillover, but "[a] spillover of evidence between counts does not require severance unless there is 'substantial,' 'undue,' or 'compelling' prejudice." Thomas v. United States, 849 F.3d 669, 676 (6th Cir. 2017) (quoting United States v. Fields, 763 F.3d 443, 457 (6th Cir. 2014). Moreover, "[e]ven where the risk of prejudice is high, less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice.'" United States v. Driver, 535 F.3d 424, 427 (6th Cir. 2008) (citation omitted). Prejudice of that sort has not been shown.

Hardison's argument also fails to take into account that he is charged with a RICO conspiracy alleging that he actively participated in the ongoing affairs of a criminal organization. To the extent his claim is that he withdrew from the conspiracy, that claim, as already noted is an affirmative defense that he must prove. "'Mere cessation of activity is not sufficient' to establish withdrawal from a conspiracy . . . , and a defendant's arrest or incarceration does not qualify as an affirmative, volitional act of withdrawal." United States v. Robinson, 390 F.3d 853, 882 (6th Cir. 2004) (internal citations omitted); see also United States v. Johnson, 737 F.3d 522, 526 (8th Cir. 2013) ("Incarceration alone does not constitute withdrawal."); United States v. Riddle, 249 F.3d 529, 539 (6th Cir. 2001) (stating that "mere fact of . . . incarceration is insufficient to establish the volitional act necessary for withdrawal" from a conspiracy); United States v. Gonzalez, 940 F.2d 1413, 1427 (11th Cir. 1991) ("[N]either arrest nor incarceration automatically triggers withdrawal from a conspiracy.").

Nor have Defendants established truly antagonistic defenses, or that co-Defendants have given statements that implicate them and impact their right to confront witnesses. Hardison makes no such claim, while Burks asserts "some of the co-defendants may have given statements implicating themselves and/or others in some of the crimes charged in the indictment," and that "[t]here may also be defenses asserted by some co-defendants that are prejudicial to Maurice Burks" (Doc. No. 566 at 1-2, 3), but identifies none. Luke claims that "some defenses may be conflicting, but this is "an analysis that can only be completed closer to trial," and states that <u>Bruton</u> issues "may arise" even though "the defense is unaware that any such statements exist." (Doc. No. 698 at 4, 5).

In <u>Bruton v. United States</u>, 391 U.S. 123, 136-37 (1968), the Supreme Court held that the Confrontation Clause of the Sixth Amendment is violated by the introduction of an incriminating out-of-court statement by a non-testifying co-defendant, even if the court gives a limiting instruction that the jury may consider the statement only against the co-defendant. This ruling, however, does not preclude the admission of a co-defendant's statement at a joint trial. The statement can be "redacted to eliminate not only the defendant's name, but any reference to his or her existence." <u>Gray v. Maryland</u>, 523 U.S. 185, 181 (1987). This may be done "by replacing the co-defendant's name with a neutral pronoun or other generalized phrase." <u>United States v. Winston</u>, 55 F. App'x 289, 294 (6th Cir. 2003) (collecting cases).

As for potentially antagonistic defenses, "in order to prevail on a motion to sever, a defendant mush show that the antagonism will mislead or confuse the jury. . . . The defendant carries the heavy burden of making a strong showing of prejudice." <u>United States v. Weiner</u>, 988 F.3d 629, 634 (6th Cir. 1993). In other words, "[t]he burden is on defendants to show that an antagonistic defense would present a conflict 'so prejudicial that defenses are irreconcilable, and the jury will unjustifiably infer that this conflict alone demonstrates that both are guilty.'" <u>United States v.</u>

Gardiner, 463 F.3d 445, 473 (6th Cir. 2006); (quoting United States v. Warner, 971 F.2d 1189, 1196 (6th Cir. 1992)). Neither Burks, Hardison, or Luke have carried that burden.

In sum, "to prevail on a motion for severance, a defendant must show compelling, specific, and actual prejudice from a court's refusal to grant the motion to sever." United States v. Saadey, 393 F.3d 669, 678 (6th Cir. 2005) (citing United States v. Sherlin, 67 F.3d 1208, 1215 (6th Cir.1995)); see also Warner, 971 F.2d at 1196 ("A showing that a defendant would have a better chance of acquittal in a separate trial does not establish prejudice requiring severance. [ ] To show enough prejudice to require severance, a defendant must establish substantial prejudice."). Severance should not be granted where the same evidence is admissible against all defendants, nor should it be granted where evidence is admissible against some defendants but not others. Warner, 971 F.2d at 1196. Moreover, "a defendant is not entitled to severance because the proof is greater against a co-defendant." Id. (citations omitted); accord, Gardiner, 463 F.3d at 473.

Given that (1) "[t]here is a preference in the federal system for joint trials of defendants who are indicted together" because "[t]hey promote efficiency and serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts," Zafiro, 506 U.S. at 537, (2) "the risk of prejudice to defendants in a joint trial is presumably low, because 'juries are presumed capable of sorting evidence and considering separately each count and each defendant,'" United States v. Caver, 470 F.3d 220, 238 (6th Cir. 2006); and (3) defendants have not carried the "strong burden" of showing "substantial, undue, or compelling prejudice," id., the Motions to Sever filed by Hardison (Doc. No. 642), Burks (Doc. No. 566) and Luke (Doc. No. 698) are **DENIED**.[14]

---

[14] By email dated October 26, 2018, the Government notified the Court and defense counsel that the request to seek the death penalty as to Hardison had been approved. Obviously this ruling does not preclude the possibility of severing Hardison based upon that recent development.

# X. __Motion for Jury View__

Burks requests that the Court allow a jury view of C-Ray's social club so that the jury can view the scene of Wright's death. That request will be denied at this time.

Allowing or disallowing a request for a jury to view a crime scene is discretionary, United States v. Wilson, 579 F. App'x 338, 345 (6th Cir. 2014), if not "highly discretionary," United States v. Moonda, 347 F. App'x 192, 197 (6th Cir. 2009). "In making this determination, the court may consider such factors as the orderliness of the trial, whether the jury would be confused or misled, whether it would be time-consuming or logistically difficult, and whether cross-examination had been permitted regarding the details of the scene." United States v. Crochiere, 129 F.3d 233, 236 (1st Cir. 1997); see United States v. Sydnor, No. CRIM.A. 2:08-05-DCR, 2008 WL 3077523, at *1 (E.D. Ky. Aug. 4, 2008) (following Corchiere).

Acknowledging that a jury view is discretionary, Burks argues:

> The physical setting of C-Ray's is going to be a central focus of both the prosecution and defense for the charge that Maurice Burks is guilty of causing Mr. Wright's death. While the Government and the defense will undoubtedly utilize photographs and diagrams to attempt to paint the picture of the events leading to Mr. Wright's death, neither photographs nor diagrams will be able to provide the jury with a perfectly clear picture of the physical setting at C-Ray's.

(Doc. No. 593 at 1-2).[15] Burks goes on to assert that visiting C-Ray's would "provide the jury with the best possible opportunity to envision the scene of Mr. Wright's shooting." (Id. at 2).

Because much the same can be said about most physical crime scenes, Burks' arguments fall short of persuading the Court that a jury view is necessary. Indeed, he concedes that both he and the Government will present photographs and diagrams depicting the scene, and the Government represents that it has provided a great deal of discovery relating to C-Ray's, including "multiple

---

[15] Wright is referenced in the Second Superseding Indictment as "M.W."

bodycam videos taken by a CPD detective of the area outside of C-Ray's on the night of the murder; a CPD video of the inside of C-Ray's taken during the daylight hours; hundreds of CPD photographs taken inside and outside of C-Ray's; and multiple CPD diagrams of C-Ray's." (Doc. No. 730 at 4).

Further, the Court cannot ignore the logistical problems such an excursion would create. On this point, the Government argues that Burks' "proposal requires transporting the Court, twelve jurors, four (or more) additional alternate jurors, a court reporter, numerous incarcerated defendants, 15 defense attorneys, at least two prosecutors, the government's case agent, and multiple members of the United States Marshals Service ("USMS") to view a nightclub, presumably in the middle of the day." (Doc. No. 730 at 3-4). The Government also notes that it would be difficult to hide from the jury the shackles Defendants will likely need to wear if they were allowed to walk around C-Ray's during a jury view. According to the Government, Supervisory Deputy U.S. Marshal Jeff Dill has indicated that "accommodating [Burk's] request would be extraordinarily difficult, if not impossible, given all of these logistical concerns." (Id. at 4 n.1). Dill's opinion is, of course, an important factor to take into consideration. See Moonda, 347 F. App'x at 197 (giving deference to Marshal's opinion that jury view would create a "logistical nightmare").

It may be, however, that Defendants' presence would not be necessary because "there is no absolute constitutional right for a criminal defendant to be present during a jury view of a crime scene." United States v. Banks, 213 F. App'x 155, 158 (4th Cir. 2007) (citing Snyder v. Massachusetts, 291 U.S. 97, 107-08 (1934), overruled on other grounds by Malloy v. Hogan, 378 U.S. 1 (1964)). Or there may be alternatives, such as allowing Defendants to participate in the jury view while secured in an unmarked vehicle. Id.; see United States v. Simmons, 380 F. App'x 323, 326 (4th Cir. 2010) (describing juror view where defendant remained in van with Marshals). Nor does the Government explain why all of the Defendants and all defense counsel would need to be

transported to C-Ray's, as opposed to only those involved with charges related to the murder at C-Ray's. In any event, C-Ray's, located at 2481 Fort Campbell Boulevard is approximately 60 miles from the federal courthouse in Nashville, and an hour's drive under the best of circumstances. Certainly there would still be a large number of logistical problems and security concerns, even if the view is limited to the Court, the jurors and alternate jurors, prosecutors, and Burks' defense counsel.

In his reply brief, Burks argues that, because "the Court has set aside the week of November 26th for hearings in this case, it would be appropriate for the Court to require the Government to bring the exhibits it believes will 'best' depict C-Ray's nightclub and to wait until that hearing to make further argument on this consideration." (Doc. No. 772 at 4). That would be one way to address the issue, but it fails to take into account that, even though a picture may be worth a thousand words, they can sometimes be better understood through the testimony of witnesses and cross examination. See Crochiere, 129 F.3d at 236 (collecting cases) ("A court generally acts within [its] discretion in denying a motion for a view when there is sufficient evidence describing the scene in the form of testimony, diagrams, or photographs."); United States v. Maxie, 294 F. App'x 247, 249 (8th Cir. 2008) (finding no abuse of discretion in refusing jury view where the record includes several photographs of the scene, a diagram, and the testimony and extensive cross-examination of the two detectives who were present at the scene); see also United States v. Chiquito, 175 F. App'x 215, 217–18 (10th Cir. 2006) (observing that nothing prevents defense counsel from obtaining photographs if he believes the government's to be inadequate). It is better, the Court believes, to deny the motion for now, subject to revisiting the issue should the jury not be presented with a fair depiction of C-Ray's.

Accordingly, Burks Motion for a Jury View (Doc. No. 593) is **DENIED WITHOUT PREJUDICE**.

### XI. <u>Motion to Dismiss Count Four for Improper Joinder of Offenses</u>

Whitlock requests that Count Four be dismissed because it improperly joins two separate and distinct offenses and is therefore duplicitous. That Count reads:

> On or about September 1, 2007, in the Middle District of Tennessee, **REX ANDREW WHITLOCK**, during and in relation to a crime of violence for which he may be prosecuted in a court of the United States, namely, the murder in aid of racketeering of J.H. charged in Count Three of the Indictment, did use and carry a firearm, and in furtherance of such crime, did possess a firearm, and in the course of that crime did cause the death of a person through the use of a firearm, which killing is murder as defined in Title 18, United States Code, Section 1111(a), namely, **REX ANDREW WHITLOCK** caused the death of J.H. by discharging a firearm at J.H.
>
> In violation of Title 18, U.S.C. § 924(j).

(Doc. No. 380 at 24).

Section 924(j) authorizes the death penalty or imprisonment for life where a defendant's violation of 18 U.S.C. § 924(c) results in murder. Section 924(c), in turn, criminalizes two distinct firearm offenses: (1) a 'use or carriage' offense, which has "during and in relation to' as its 'standard of participation,' and (2) a 'possession' offense, which has 'in furtherance of' as it standard of participation." <u>United States v. Savoires</u>, 430 F.3d 376, 379 (6th Cir. 2005).

Relying primarily on <u>Savoires</u>, Whitlock argues that, "[b]ased on the wording of Count Four, a jury might improperly conflate the two offenses set forth in § 924(c) and find Mr. Whitlock guilty of an 'offense' that is not criminalized by § 924(c) (or by § 924(j)). Accordingly, because Count Four improperly charges two separate and distinct crimes in a single count [using or carrying a firearm in relation to a crime of violence of drug trafficking crime *and* possessing firearm in furtherance of such a crime], that count should be dismissed." (Doc. No. 546-1 at 3).

In Savoires, like here, defendant was charged with both possessing a firearm in furtherance of a crime, and using and carrying that firearm. Based upon United States v. Combs, 369 F.3d 925, 933 (6th Cir. 2004), the Court of Appeals held that "the § 924(c) charge against Mr. Savoires was clearly duplicitous – *i.e.,* it "set[ ] forth separate and distinct crimes" in a single count." Savoires, 430 F.3d at 379–80. Noting that "[a] duplicitous charge calls into question the unanimity of a verdict of guilty," id., the Sixth Circuit reversed Savoires' 924(c) conviction.

In reversing the conviction, the Sixth Circuit in Savoires acknowledged the settled principle a duplicitous "charge is not prejudicial *per se*, because proper jury instructions can mitigate the risk of jury confusion and alleviate the doubt that would otherwise exist as to whether all members of the jury had found the defendant guilty of the same offense." Id. This has long been the law in the Sixth Circuit. See United States v. Eaton, 784 F.3d 298, 308 (6th Cir. 2015) (citation omitted) ("A special unanimity instruction is a means of clarifying a so-called "duplicitous" charge, or one that 'sets forth separate and distinct crimes in one count.'"); United States v. Kakos, 483 F.3d 441, 444–45 (6th Cir. 2007) ("When confronting a challenge to duplicity not raised under Rule 12, this Court has frequently looked to the instructions actually given at trial to assess the risk that a defendant was convicted by a non-unanimous verdict."); United States v. Lloyd, 462 F.3d 510, 515 (6th Cir. 2006) ("Count two of the indictment was duplicitous, but the jury instructions clarified the two separate offenses and the verdict form reflects that all members of the jury convicted Lloyd of the use offense."); United States v. Blandford, 33 F.3d 685, 699 (6th Cir. 1994) ("In light of this unanimity instruction, we reject Blandford's duplicity argument."); United States v. Robinson, 651 F.2d 1188, 1194 (6th Cir. 1981) ("[A] duplicitous or multiplicitous indictment is remediable by the court's instruction to the jury particularizing the distinct offense charged in each count in the indictment.").

Proper instructions and a unanimity verdict aside, duplicitous charges can be cured by other means. For example, "courts have held that prior to a defendant's conviction, prejudice to the defendant can be avoided by having the government elect to proceed based upon only one of the distinct crimes included within a duplicitous count." United States v. Sturdivant, 244 F.3d 71, 79 (2d Cir. 2001) (collecting cases). This includes the Sixth Circuit. Kakos, 483 F.3d at 444 (internal citation omitted) ("A defendant moving pursuant to Rule 12 can request that a duplicitous indictment be dismissed, . . . he can attempt to force the government to elect the charge within the count upon which it will rely, or he can ask the court to particularize the distinct offenses contained within a count"); United States v. Shumpert Hood, 210 F.3d 660, 663 (6th Cir. 2000) (same).

Accordingly, Whitlock's Motion to Dismiss Count Four for Improper Joinder (Doc. No. 546) is **DENIED**.[16] Whitlock may raise the issue of a special unanimity instruction at the appropriate time, or seek to avail himself of the opportunities endorsed in Kakos.

### XII. Motion to Dismiss Count Four – Failure to State an Offense

As noted in the previous section, Count Four references the murder in aid of racketeering of J.H. that is charged in Count Three. After incorporating portions of Count One, identifying the Gangster Disciples as an "enterprise" for purposes of RICO, and describing assorted alleged acts of racketeering, Count Three alleges:

> 4. On or about September 1, 2007, in the Middle District of Tennessee, **[11] REX ANDREW WHITLOCK**, for the purpose of maintaining and increasing position in the Gangster Disciples, an enterprise engaged in racketeering activity, did knowingly murder J.H. In violation of Tenn. Code Annotated, Section 39-13-202 and 39-13-210.

---

[16] In his reply brief (Doc. No. 778), Whitlock submits that "[w]e are presently over four months away from trial [and] [t]he government has plenty of time to file another superseding Indictment to correct the § 924(c) charges, if it so chooses." Given the lateness in the proceeding and what has occurred in other cases in the past, that is an invitation the Courts declines to extend.

In violation of 18, United States Code, Section 1959(a)(1).

(Doc. No. 380 at 23).

Noting that a "crime of violence" under Section 924(c)(3) must fall under Section 924(c)'s "force clause" (18 U.S.C. § 924(c)(3)(A)) or its "residual clause (18 U.S.C. § 924(c)(3)(B))," Whitlock argues that "the charged predicate offense cannot, as a matter of law, satisfy the 'force clause' of § 924(c), because it is possible to commit the charged offense without the use, attempted use, or threatened use of physical force against the person or property of another." (Doc. No. 555-1 at 2). He also argues that Section "924(c)'s 'residual clause' is unconstitutional based on the Supreme Court's rulings in <u>Johnson v. United States</u>, 135 S. Ct. 2551 (2015), and <u>Sessions v. Dimaya</u>, 138 S. Ct. 1204 (2018)." <u>Id</u>.

Whether the residual clause of Section 924(c) is unconstitutional was seemingly resolved by the Sixth Circuit in <u>United States v. Taylor</u>, 814 F.3d 340, 376 (6th Cir. 2016). There, the court held that the definition of a "crime of violence," which includes a felony "that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense," 18 U.S.C. § 924(c)(3), is not void for vagueness, notwithstanding <u>Johnson</u>.

Even though <u>Taylor</u> proceeded <u>Dimaya</u>, which held that the similarly worded residual clause defining a "crime of violence" as set forth in the Immigration and Nationality Act was impermissibly vague, the Sixth Circuit has refused to reverse course. It avoided doing so most recently in <u>United States v. Richardson</u>, No. 17-2157, 2018 WL 4924782, at *5 (6th Cir. Oct. 11, 2018), while at the same time acknowledging that at least three circuit courts have decided that <u>Dimaya</u> mandates a different conclusion. Indeed, the court "[l]eft the continuing viability of <u>Taylor</u> for another day," <u>id</u>., weeks after the Supreme Court in <u>Manners v. United States</u>, No. 17-8035, 2018 WL 1278398

at *1 (S. Ct. Oct. 1, 2018), granted certiorari and remanded the case for consideration of whether Section 924(c)(3)(B) is now impermissibly vague in light of Dimaya.

This Court has grappled with the interplay between Johnson, Dimaya, and Taylor in the past, see United States v. Kimbrough, 319 F. Supp. 3d 912, 913-18 (M.D. Tenn. 2018), but finds it unnecessary to do so again here. This is because, given the language and charges in the Second Superseding Indictment surrounding the murder of J.H., the residual clause of Section 924(c) does not come into play. The Court reaches this conclusion for three reasons.

First, Count Four specifically alleges Whitlock caused the death of J.H. through violence, and this death constituted a murder in violation of 18 U.S.C. § 1111(a). That statute provides:

> Murder is the unlawful killing of a human being with malice aforethought. Every murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing; or committed in the perpetration of, or attempt to perpetrate, any arson, escape, murder, kidnapping, treason, espionage, sabotage, aggravated sexual abuse or sexual abuse, child abuse, burglary, or robbery; or perpetrated as part of a pattern or practice of assault or torture against a child or children; or perpetrated from a premeditated design unlawfully and maliciously to effect the death of any human being other than him who is killed, is murder in the first degree.
>
> Any other murder is murder in the second degree.

18 U.S.C.A. § 1111(a). It cannot be seriously argued that murder is anything other than a crime of violence under that statute. See e.g., United States v. Russell, No. 05-CR-401, 2018 WL 3213274, at *3 (E.D.N.Y. June 29, 2018) (notwithstanding Johnson and Dimaya, murder in aid of racketeering "qualifies as a 'crime of violence' under the elements clause of § 924(c)(3), not its residual clause"); Percy v. United States, No. CV-16-02066-PHX-DGC, 2017 WL 2838469, at *4 (D. Ariz. July 3, 2017) (holding that even second degree murder under Section 1111 is a crime of violence for purposes of Section 924(c)); United States v. Lobo-Lopez, 206 F. Supp. 3d 1084, 1096 (E.D. Va. 2016) ("[C]ontrary to defendant's contention, felony murder, as defined by § 1111, constitutes a

crime of violence pursuant to the force clause of § 924(c).");United States v. Mathis, No. 3:14CR00016, 2016 WL 8285758, at *5 (W.D. Va. Jan. 25, 2016) (finding that because VICAR-murder is a crime of violence, it was unnecessary to discuss challenge to the residual clause); United States v. Moreno-Aguilar, 198 F. Supp. 3d 548, 554 (D. Md. 2016) (finding that section 1111 "necessarily involve[s] use of physical force against another and thus [is a crime] of violence under the force clause of § 924(c)"); United States v. Heard, No. 13-CR-00764-WHO-7, 2016 WL 9088834, at *2 (N.D. Cal. Jan. 29, 2016) ("I am far from convinced that section 1111(a) murder is not a categorical crime of violence under the force clause."); see also United States v. Joseph, 465 F. App'x 690, 696 (9th Cir. 2012) ("The government could prove 'assault' with a deadly weapon under federal common law, and was not required to do so under state law. Neither the VICAR statute nor any other authority requires that 'assault' be defined by the state whose law has been violated."); United States v. Le, 316 F. Supp.2d 355, 359–60 (E.D. Va. 2004) ("[I]t is clear that Congress intended to include within the scope of § 1959 [ ] generic conduct amounting to an assault with a dangerous weapon, in violation of state law regardless of what label a state may attach to that conduct.").

Second, even if the Court ignores the plain language of Count Four and looks to the alleged violation of state law set forth in Count Three, the result is the same. At the time of J.H.'s alleged murder, Tennessee law defined "first degree murder" as

> (1) A premeditated and intentional killing of another;
>
> (2) A killing of another committed in the perpetration of or attempt to perpetrate any first degree murder, act of terrorism, arson, rape, robbery, burglary, theft, kidnapping, aggravated child abuse, aggravated child neglect, rape of a child, aggravated rape of a child or aircraft piracy; or
>
> (3) A killing of another committed as the result of the unlawful throwing, placing or discharging of a destructive device or bomb.

Tenn. Code Ann. § 39-13-202(a).  At the same time, "second degree murder" was defined as:

(1) A knowing killing of another, or

(2) A killing of another that results from the unlawful distribution of any Schedule I or Schedule II drug, when the drug is the proximate cause of he death of the user.

Tenn. Code Ann. § 39-13-210(a).  Because Count Three does not differentiate between Sections 39-13-202 and 39-13-210, and because J.H.'s murder could have resulted from the use of drugs and therefore would not necessarily be through force or violence under Section 924(a)(b)(3), Whitlock seeks dismissal of Count Four.

In making his argument, Whitlock fails to consider that the Count Three is written in the conjunctive, *i.e.* "in violation of Tennessee Code Annotated, Sections 39-13-202 *and* 39-13-210." (Doc. No. 380 at 23).  This is not improper.  "It is settled law that an offense may be charged conjunctively in an indictment where a statute denounces the offense disjunctively. Upon the trial, the government may prove and the trial judge may instruct in the disjunctive form used in the statute." United States v. McAuliffe, 490 F.3d 526, 534 (6th Cir. 2007) (citation omitted); accord, United States v. Pirosko, 787 F.3d 358, 368 (6th Cir. 2015).

As for Tenn. Code Ann. 39-13-202, that statute defines second degree murder to include the death of another as a result of the unlawful distribution or narcotic drugs, or alternatively the "knowing killing of another."  This is a "disjunctive definition of the crime  [requiring] "differing *mens rea* for each type of second degree murder," and therefore "Tenn. Code Ann. § 39-13-210(a) is divisible."  Young v. United States, No. 15-2575-STA-TMP, 2016 WL 8711562, at *5 (W.D. Tenn. Dec. 16, 2016).  "In other words, it is possible to commit second degree murder under Tennessee law 'in a way that would constitute a [violent felony] and in a way that would not.'" Id. (brackets in original) (quoting United States v. Cooper, 739 F.3d 873, 878 (6th Cir. 2014).

In determining whether a statutory offense is a "crime of violence," the Sixth Circuit has observed:

> We use a "categorical approach" to determine whether an offense constitutes a "crime of violence" for purposes of § 924(c)(3). . . . Under the categorical approach, a court "focuses on the statutory definition of the offense, rather than the manner in which an offender may have violated the statute in a particular circumstance." . . . "Courts use 'a variant of this method—labeled (not very inventively) the "modified categorical approach"—when a prior conviction is for violating a so-called "divisible statute," ' which 'sets out one or more elements of the offense in the alternative.'"
>
> . . . . "If [the underlying] statute could be violated in a way that would constitute a crime of violence and in a way that would not, we look beyond the statutory language and examine" a limited set of documents "to determine whether the conviction necessarily depended on the commission of a crime of violence."

United States v. Rafidi, 829 F.3d 437, 444 (6th Cir. 2016) (internal citations omitted). The limited set of documents, also known as "Shephard documents," consist of the "charging document, written plea agreement, transcript of plea colloquy, and any explicit factual finding by the trial judge to which the defendant assented." Shepard v. United States, 544 U.S. 13, 16, 125 S.Ct. 1254, 161 L.Ed.2d 205 (2005).

The charging document in this case – the Second Superseding Indictment – alleges (as noted) that J.H. was shot and killed by Whitlock. This is further alleged in the overt acts that are incorporated by reference into Count Three. Specifically, over act "j" alleges that Whitlock "shot and killed J.H., a member of the rival Bloods gang, on Tobacco Road in Clarksville, Tennessee." (Doc. No. 380 at 12). Clearly, Whitlock is charged with a crime of violence for purposes of Section 924(c).

Third, and notwithstanding Whitlock's a lengthy response brief wherein he insists that the Court cannot look beyond the 924(c)'s language because "in Taylor, 814 F.3d at 378, and United States v. Rafidi, 829 F.3d 437, 444-45 (6th Cir. 2016), [the Sixth Circuit] definitively held that the

categorical approach applies to § 924(c)(3)," (Doc. No. 786 at 8),[17] it is far from clear that resort

to the categorical approach is even appropriate in these circumstance. There is a growing consensus

among the courts that the categorical approach has no application when a court is considering a

pretrial motion to dismiss. This is because the categorical approach was developed under different

circumstances; specifically to address sentencing concerns.

As one court has explained:

> Practically speaking, the categorical approach "ignor[es] the particular facts of the case" and allows the court to "focus solely on whether the elements of the crime of conviction sufficiently match the elements of" the generic offense. Mathis v. United States, —— U.S. ——, 136 S.Ct. 2243, 2248, 195 L.Ed.2d 604 (2016). The Supreme Court adopted the categorical approach in 1990 when it was "called upon to determine the meaning of 'burglary' " for purposes of determining whether a sentence enhancement under the Armed Career Criminal Act ("ACCA") was appropriate. Taylor v. United States, 495 U.S. 575, 577-78, 110 S.Ct. 2143, 109 L.Ed.2d 607 (1990).
>
> \*                       \*                       \*
>
> [In contrast, a] motion to dismiss challenges the legal sufficiency of a count that requires the government to prove that "during and in relation to any crime of violence" the defendants used or carried a firearm. 18 U.S.C. § 924(c)(1)(A). At the motion to dismiss stage, the court's inquiry is the converse of the categorical approach: Instead of deciding whether every manner of commission of the crime of kidnapping would constitute a crime of violence, [the court] need only decide whether some manner of commission of that crime could constitute a crime of violence. If so, the sufficiency inquiry shifts to the Rule 29 and post-trial motion phase when it will be appropriate to decide whether the government's evidence is sufficient to prove that the defendants actually did carry or use a firearm during the commission of a crime of violence. [The court has] no need to engage in "elaborate factfinding" in order to determine that the kidnapping, as alleged, satisfies the predicate crime of violence threshold. Similarly, because the jury will be finding facts, including whether the alleged kidnapping satisfies the "crime of violence" element of the charged offense, there are no Sixth Amendment concerns present. Thus, the fundamental premise upon which the categorical approach depends is

---

[17] Whitlock's reliance on Taylor is curious because, in that case, the Sixth Circuit upheld the residual clause of 924(c). Indeed, in his opening brief Whitlock argued that "the reasoning of Dimaya compels the conclusion that Taylor was wrongly decided," and that Dimaya compels the conclusion that Johnson applies to the residual clause in § 924(c) cases." (Doc. No. 555 at 5-6).

absent at the pretrial motion to dismiss stage.

United States v. Cook, No. 3:17-CR-00065 (SRU), 2018 WL 3637475, at *2-3 (D. Conn. July 31, 2018).   More succinctly, another court observed:

> Cases in which the categorical approach has been utilized outside the sentencing contexts are sparse. In the vast majority of cases, this one dimensional analytical construct is used by sentencing courts conducting a cold record review of a prior conviction to determine whether its elements square with the definition of "crime of violence" articulated in § 924(e)(3), the Armed Career Criminal Act. Unlike the retrospective analysis conducted by sentencing courts, trial courts have the benefit of viewing the evidence as it unfolds.

United States v. Standberry, 139 F. Supp. 3d 734, 737 (E.D. Va. 2015).

Numerous other courts have come to the same conclusion.  See e.g., United States v. Wells, No. 2:14–cr–00280, 2015 WL 10352877, at *4 (D. Nev. Dec. 30, 2015) (concluding "that the categorical approach does not apply with respect to a pretrial motion to dismiss charges brought under 18 U.S.C. § 924(c)"); United States v. Monroe, 158 F.Supp.3d 385, 390 (W.D. Pa.2016) (same); United States v. Church, No. 1:15–CR–24–TLS, 2015 WL 7738032, at *5–6 (N.D. Ind. Dec. 1, 2015) (holding that the categorical approach does not apply to § 924(c)); United States v. Checora, 155 F.Supp.3d 1192, 1194 (D. Utah 2015) (same).  This includes district courts within the Sixth Circuit.  See e.g., United States v. Moore, No. 15-20552, 2016 WL 2591874, at *5 (E.D. Mich. May 5, 2016) ("The categorical approach does not apply to a pretrial motion to dismiss an indictment, because the phrase 'crime of violence' is an element of § 924(c), not a sentencing factor, and therefore 'must be submitted to a jury and found beyond a reasonable doubt."); United States v. Morgan, No. CR 14-20610, 2015 WL 9463975, at *4 (E.D. Mich. Dec. 18, 2015) "[T]his Court's examination of the relevant authorities failed to produce a single case where a federal court explicitly endorsed the 'categorical approach' in evaluating the validity of the criminal charges of an indictment on a pretrial motion to dismiss.").

While most of the cases rejecting the categorical approach when analyzing motions to dismiss have been decided thus far at the district court level, there is also some support for this rejection at the appellate court level. See Weingarten v. United States, 865 F.3d 48, 59 (2d Cir. 2017) (stating that "[t]he Supreme Court's modern categorical approach jurisprudence is confined to the post-conviction contexts of criminal sentencing and immigration deportation cases"); United States v. Cravens, 719 F. App'x 810, 818 (10th Cir. 2017) (O'Brien, J. concurring) (observing that a number of district courts have questioned the use of the categorical approach in Section 924(c) cases, "at least in the context of a pretrial motion to dismiss," and observing that "[i]t is time to re-think our use of the categorical approach in § 924(c) cases" because "[e]asily determined facts are always preferable to rank speculation").  The Sixth Circuit appears not to have addressed the issue, but support for the inapplicability of the categorical approach in these circumstances can be found in the observation in Shuti v. Lynch, 828 F.3d 440, 449 (6th Cir. 2016) (emphasis added), that "[u]nlike the [Armed Career Criminal Act] and [the Immigration and Naturalization Act], which require a categorical approach *to stale predicate convictions*, 18 U.S.C. § 924(c) is a criminal offense that requires an ultimate determination of guilt beyond a reasonable doubt – *by a jury, in the same proceeding*.  This makes all the difference."

Because the residual clause is not a factor in light of the VICAR allegations and the wording of the Superseding Indictment, Whitlock's Motion to Dismiss Count Four for failure to state an offense (Doc. No. 555) is **DENIED**.

### XIII. Motion to Suppress Evidence Obtained September 29, 2003

On September 29, 2003, a vehicle in which Whitlock was a passenger was stopped by a CPD officer for failure to use a turn signal.  During the stop, the officer allegedly smelled burnt marijuana emanating from the automobile, and ordered the occupants out of the vehicle. Even though a pat-

down search of Whitlock and a search of the vehicle revealed nothing, Whitlock was held at the scene and other officers were called. Whitlock was then taken to the police station and strip-searched. That search revealed a rocklike substance found in Whitlock's rectum. Arguing that the discovery that has been provided reveals nothing to suggests that the officers had a basis to detain him after the initial pat-down, Whitlock moves to suppress the fruits of the search.

In response, the Government indicates that it does not intend to introduce evidence of this incident in its case-in-chief at trial, but reserves the right to introduce such evidence for impeachment purposes. In reply, Whitlock concedes that, pursuant James v. Illinois, 493 U.S. 307, 312 (1990), the Government "is permitted to utilize that illegally obtained evidence for the limited purpose of impeaching Mr. Whitlock should he take the stand at trial and should he commit perjury during the course of his testimony." (Doc. No. 780 at 2). With that understanding, Whitlock's Motion to Suppress Evidence Obtained on September 29, 2003 (Doc. No. 550) is **GRANTED** and the evidence obtained during the traffic stop on that date is **SUPPRESSED** as to Whitlock. This ruling, however, applies only to the Government's case-in-chief and does not apply to impeachment.

## XIV. <u>Motion to Dismiss – Statute of Limitations</u>

"The crime of conspiracy carries a five year statute of limitations. 18 U.S.C. § 3282." <u>United States v. Brown</u>, 332 F.3d 363, 373 (6th Cir. 2003). Luke, who is charged in both Count One (the RICO conspiracy) and Count Two (the drug trafficking conspiracy), seeks to dismiss the Second Superseding Indictment as to him on statute of limitations grounds. He argues:

> With respect to Counts One and Two, there is no specific allegation in the indictment indicating any act taken by Mr. Luke within the statute of limitations. Indeed, the indictment allegations, that are specific to Luke, show his last act is outside the statute. Mr. Luke was not involved in criminal activity after October 2012, according to the specific indictment allegations. Thus, the last date he could have been indicted was October 31, 2017. This [instant] federal prosecution was not commenced until December 14, 2017.

(Doc. No. 699 at 6). Luke further assert that "[a]fter review of more than 300 GBs of government discovery, there is not one scintilla of evidence to support any argument that Mr. Luke was a member of the Gangster Disciples within the necessary five-year statutory limitation timeframe." (Id. at 6). Finally, Luke argues that "[a]n evidentiary hearing will be required to establish the facts necessary for the Court to decide" the statute of limitations issues. (Id. at 5). Luke's arguments fail.

"[A] RICO conspiracy offense is complete, thus commencing the running of the five-year statute of limitations, only when the purposes of the conspiracy have either been accomplished or abandoned." United States v. Tocco, 200 F.3d 401, 425 (6th Cir. 2000) (quoting United States v. Salerno, 868 F.2d 524, 534 (2d Cir.1989)). Further, insofar as the RICO count is charged as a conspiracy instead of as a substantive count, "a defendant need not know about every member and component of the enterprise; he need only know "the general nature of the enterprise and that the enterprise extends beyond his role." Id., (citing United States v. Eufrasio, 935 F.2d 553, 577 n. 29 (3d Cir.1991)). As the Second Circuit has explained:

> Although a "substantive RICO charge is barred by limitations as to any defendant unless *that defendant* committed a predicate act within the five-year limitations period," a RICO conspiracy "is complete, thus commencing the running of the five-year statute of limitations, only when the purposes of the conspiracy have either been accomplished or abandoned." . . . Accordingly, even if a defendant engaged in predicate conduct that occurred outside of the statute of limitations, that defendant remains liable for RICO conspiracy unless the evidence shows that the conspiracy concluded or he withdrew from that conspiracy more than five years before the indictment. . . . This is because once the government meets its burden of proof to establish a RICO conspiracy, "it is entitled to a presumption that the conspiracy continued until [the] defendant demonstrate[s] otherwise."

United States v. Yannotti, 541 F.3d 112, 123 (2d Cir. 2008) (emphasis in original) (citations omitted).

The same is true for the drug conspiracy charged in Count Two. "In a § 846 conspiracy, the government must show the willful formation of a conspiracy and the willful membership of the

defendant in the conspiracy, but need not prove that defendant committed an overt act in furtherance of the conspiracy." United States v. Layne, 192 F.3d 556, 567 (6th Cir. 1999).  Therefore, "[i]n order to avoid running afoul of the statute of limitations, the government ha[s] to show that the specific conspiracy in which [Defendant] had been involved was on-going during the statute of limitations period," and "[i]f the conspiracy was on-going, the 'presumption of continuity' makes [Defendant] liable for the acts of his co-conspirators, even if he did not personally act on behalf of the conspiracy during the relevant statute of limitations period."  United States v. Fantroy, 146 F. App'x 808, 817–18 (6th Cir. 2005)

To be sure, "[t]he presumption of continuity does not carry the same force for every member of a conspiracy," particularly "in large scale drug conspiracies where levels of participation vary greatly among the conspirators."  Brown, 332 F.3d at 374.  "Where a conspirator is 'deep in the general business of the 'ring,' the presumption of continuity is the strongest," but, "at some point, the lack of evidence of participation in a conspiracy by a low-level drug conspirator for a substantial period of time suffices to extinguish the presumption of continuity."  Id. (citation omitted).  While "the presumption of continuity can be 'extinguished by the affirmative defense of withdrawal from the conspiracy," United States v. Galan, 436 F. App'x 467, 469 n.1 (6th Cir. 2011) (quoting Brown, 332 F.3d 363, 374 (6th Cir. 2003), withdrawal, as previously noted, must be established at trial.

Accordingly, Luke's Motion to Dismiss on Statute of Limitations grounds (Doc. No. 699) is **DENIED**.

## XV.  Motion for Jury Questionnaire

Rule 24 provides that "the court may examine prospective jurors or may permit the attorneys for the parties to do so," Fed. Crim. P. 24(a), and "gives the court very broad discretion on the conduct of the voir dire examination of prospective jurors."  United States v. Schmucker, 815 F.2d

413, 421 (6th Cir. 1987). This discretion extends to whether or not to permit juror questionnaires, United States v. Treacy, 639 F.3d 32, 46 (2d Cir. 2011); United States v. Phibbs, 999 F.2d 1053, 1071 (6th Cir. 1993), and a trial court abuses its discretion only "if it restricts the scope of voir dire in a manner that unduly impairs the defendant's ability to exercise his peremptory challenges or make his challenges for cause, United States v. Martinez, 981 F.2d 867, 870 (6th Cir. 1992). Thus, "[w]hile pre-trial juror questionnaires 'have become a favored device of trial lawyers,' United States v. Padilla–Valenzuela, 896 F. Supp. 968, 970 (D. Ariz.1995), it is within the sound discretion of the trial court to refuse to submit a party's questionnaire to prospective jurors," particularly where the court finds a questionnaire "invasive or simply unnecessary." Vanderbilt Mortg. & Fin., Inc. v. Flores, No. CIV.A. C-09-312, 2010 WL 4281932, at *1 (S.D. Tex. Oct. 25, 2010).

Burks has requested that prospective jurors in this case be provided with a juror questionnaire, and attaches to his Motion a "Special Juror Questionnaire" that is 14-pages long, and includes 70 questions, plus sub-parts. In response, the Government does not oppose the idea of jurors being provided a questionnaire, but objections to some questions as being "overly intrusive," and others as being "inflammatory." (Doc. No. 731 at 1-2). The Government also requests that, if the Court elects to use a juror questionnaire in this case, it be allowed "the opportunity to submit its own proposed questionnaire to the Court." (Id. at 2). In reply, Burks takes issue with the Government's characterization that some of the proposed questions are improper, and notes that the questionnaire was prepared by "an eminently qualified jury consultant and contained questions that have all been used, in similar or exact form, in courts throughout the country, both federal and state, including the Middle District of Tennessee." (Doc. No. 771 at 2). Burks also assert that his "jury consultant could come to Nashville during the week of November 26th . . . to further explain the methodology for preparing a jury questionnaire in a case like this one." (Id.).

The Court agrees with the parties that a questionnaire sent to prospective jurors would be of benefit, particularly if this case proceeds to trial in its present posture. However, the Court also believes that many of the questions are unnecessary, others are covered in the Court's standard colloquy with the jury venire, and some are intrusive. Further, the Government should be allowed input into the questions to be asked. While Burks represents that his jury consultant could be made available during the week the Court has set aside for hearings, the Court is not concerned about the methodology that was employed, and finds a hearing unnecessary. Instead, the matter of a juror questionnaire will be placed upon the Court's agenda for the status conference to be held on **November 29, 2018.**

Accordingly, Burks' Motion for Jury Questionnaire (Doc. No. 644) is **GRANTED** (assuming this case goes to trial in its present posture), but the precise questions to be asked will be resolved at a later date.

## XVI.  Remaining Motions

Hardison's Motion to Set Exhibit Review Conference (Doc. No. 641) is **DENIED AS MOOT**.  An exhibit review conference has been scheduled for January 9, 2019 though January 11, 2019.  Burks' and Hardison's Motion to Defer Setting Trial Schedule (Doc. No. 249) filed November 39, 2017 is **DENIED AS MOOT** in light of the agreed trial setting of March 1, 2019. Burk's Motion to Amend his Motion for Reconsideration (Doc. No. 516) to cite the appropriate rule is **GRANTED.**

The remaining Motions and a follow-up status conference are set for hearing as follows:

## TUESDAY, NOVEMBER 27, 2018

| Time | Motion | Type of Hearing |
|------|--------|-----------------|
| 9:00 a.m. | Whitlock's Motion to Suppress Evidence Obtained on 3/3/05 (Doc. No. 553) | Evidentiary Hearing |
| 1:00 p.m. | Whitlock's Motion to Require Immediate Production of Unredacted Witness Statements (Doc. No. 579) | Oral Argument |
| 2:00 p.m. | Whitlock's Motion to Dismiss Count Two (Doc. No. 573) | Oral Argument |
| 3:00 p.m. | Whitlock's Motion to Suppress Instagram Account (Doc. No. 584) | Oral Argument/Evidentiary Hearing |

## WEDNESDAY, NOVEMBER 28, 2018

| Time | Motion | Type of Hearing |
|------|--------|-----------------|
| 9:00 a.m. | Darden's Motion to Suppress Cell Phone Evidence (Doc. No. 636) and Supplement (Doc. No. 787) | Evidentiary Hearing |
| 2:00 p.m. | Darden's Motion for Disclosure of Grand Jury Testimony (Doc. No. 590) and Motion to Compel Disclosure of Confidential Informants (Doc. No. 646) | Oral Argument |

## THURSDAY, NOVEMBER 29, 2018

| Time | Motion | Type of Hearing |
|------|--------|-----------------|
| 9:00 a.m. | Burk's Motion for Reconsideration of Magistrate Judge's Ruling Re: Exculpatory Evidence, Witness Lists and Jencks Material (Doc. No. 515) | Oral Argument |
| 10:30 a.m. | Burk's & Jenkins' Motion for Review Re: Tattoos (530) | Oral Argument |
| 1:00 p.m. | Follow-up status conference involving all defendants and all counsel | |

At the status conference, counsel should be prepared to discuss the possible severance of Hardison from this case, juror questionnaires, and the Government's Motion to Set Plea Deadline (Doc. No. 807).

The Court believes that this Memorandum Opinion and Omnibus Order either resolves all pending Motions, sets them for hearing, or sets them on the agenda for the status conference, except as to (1) sealed matters, and (2) the Government's recently filed Motion to Consolidate Luke's Federal Cases for Trial (Doc. No. 806). To the extent that is not the case, it should be brought to the Court's attention promptly so that the Motion can be addressed, or set for a hearing.

IT IS SO ORDERED.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE