# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 3:17-cr-00124-2 |
| | ) | |
| MAURICE DUNCAN BURKS | ) | |

## MEMORANDUM OPINION

Who killed Malcolm Wright with a .45 caliber pistol at C-Ray's on November 3, 2012? A jury found that Maurice Burks did. Their verdict–finding Burks guilty on counts Ten, Eleven, Thirteen, and Fourteen of the Third Superseding Indictment–was rendered after a 25-day trial, during which more than 85 witnesses testified and more than 1,200 documents were introduced into evidence.

## I.

Impressive as the number of witnesses and document are, very little of it had to do with Burks' supposed murder of Wright. Rather, evidence was introduced against five Defendants charged in 34-counts. Those counts ran the gamut from a RICO conspiracy alleging that the Gangster Disciples was a criminal organization, to a multi-narcotic drug conspiracy, to individual drug distribution counts, to assault, and to the murder of Wright.

As it pertained to Wright's murder and Burks' alleged involvement therein, the Government relied almost exclusively on the testimony of three informants – Danyon Dowlen, a/k/a "Danger Dan" (as he liked to call himself), Dezorick Ford, and Ronnie Daniels. Kristine Gaskin, Wright's girlfriend, testified that three people were in the room when the fatal shot was fired: her, Wright, and an African-American male of medium height who was standing over Wright's body. Burks is African American, but stands 6'4" tall.

In a lengthy Memorandum Opinion and Order involving motions for judgment of acquittals by all Defendants and a motion for a new trial by Burks, the Court found there was sufficient evidence to support Burks' convictions on the Wright murder counts for purposes of Rule 29 of the Federal Rules of Criminal Procedure. United States v. Darden, No. 3:17-CR-00124, 2019 WL 3946133 (M.D. Tenn. Aug. 20, 2019).[1] However, acting as the thirteenth juror in accordance with Rule 33, the Court also found that it would be manifestly unjust to let Burks' convictions on the murder counts stand based on the credibility of the witness and the weight of the evidence, or lack thereof. In the penultimate paragraph, the Court observed:

> The Court does not know whether Burks killed Wright[.] What the Court does know, however, is that proof beyond a reasonable doubt is a standard not to be trifled with. "When the government has presented enough evidence for a conviction but the judge disagrees with the jury's resolution of conflicting evidence, a reversal is appropriate on the ground that the verdict is against the manifest weight of the evidence." United States v. Lyimo, 574 F. App'x 667, 671 (6th Cir. 2014) (citing United States v. Lutz, 154 F.3d 581, 589 (6th Cir. 1998)). That is the case with respect to Burks' convictions on the counts relating to the murder of Wright and those convictions will be vacated pending a new trial.

Id. at *25.

The Government appealed the grant of a new trial. In a 2-1 decision, the United States Court of Appeals reversed, finding that this Court abused its discretion because "[t]he evidence . . . did not weigh heavily against the verdict," but rather "set out a straightforward narrative that the jury could reasonably believe." United States v. Burks, 974 F.3d 622, 625 (6th Cir. 2020) (Burks I). In a lengthy dissent, Judge Helene N. White disagreed because "the majority employ[ed] an inappropriate standard of review, incompletely consider[ed] the record, and reject[ed] the district court's credibility

---

[1] That opinion set forth in detail the facts underlying this case and the evidence presented at trial. Because it serves as a backdrop for the present analysis, familiarity with the opinion is assumed.

and factual determinations in favor of its own." Id. at 628. Judge White went on to observe:

> Although the majority engages in its own reweighing of the evidence and disagrees with how the district court assessed the credibility of the witnesses, the majority fails to explain how the district court's factual and credibility determinations are clearly erroneous or how the district court abused its discretion. The district court appropriately acted as a thirteenth juror and its conclusions are fully supported by the record. The majority, on the other hand, inappropriately enters "the forbidden territory of re-weighing the evidence." . . . Even under the majority's flawed standard of review, however, it insufficiently engages with the district court's order and the record.

Id. at 629 (quoting United States v. Dimora, 750 F.3d 619, 627 (6th Cir. 2020)).

Burks filed a petition for rehearing *en banc* and for a writ of *certiorari*, see Burks v. United States, ___ S.Ct. ___, 2021 WL 1074194 (Mar. 22, 2021), but both were denied. This meant that the majority opinion became the law of the case and would have ended matters, but for one thing.

While the case was in the briefing stages before the Sixth Circuit, the Government allegedly discovered that it had "inadvertently" failed to disclose to Burks that, during pretrial preparation, Dowlen told the ATF and two members of the prosecution team (including the lead prosecutor) that the gun Burks used to shoot Wright "may have been a .40 caliber or a .45 caliber." (Doc. No. 1685-2 at 3). Upon receipt of the undisclosed material – memorialized in a Report of Investigation ("ROI")[2] – Burks filing a "Second Motion for New Trial Based on Newly Discovered Evidence." (Doc. No. 1685).

Notwithstanding the pendency of appeal, the Court found that it retained jurisdiction to consider the motion and denied the same. The motion was directed at Counts One and Two (the RICO and drug conspiracy counts), and what Dowlen said about the firearm had no bearing on those

---

[2] There were actually two ROIs that were not disclosed, ROI 660 and 661. The one at issue here is ROI 660, which will be referred to simply as "ROI."

3

counts. The Court observed:

> "The decision of whether to grant a new trial is committed to the 'sound discretion of the trial judge', [and] this discretion should be exercised 'only in extraordinary circumstance[s]. " United States v. Canal Barge Co., 631 F.3d 347, 357 (6th Cir. 2011) (citation omitted). Such extraordinary circumstances existed as to the counts relating to Wright's murder because, not only was the witness's testimony that Burks confessed to them inherently incredible, their testimony did not match other witness's accounts or align with the physical evidence (scant though it was) presented at trial. The new evidence that the gun Burks "maybe used" was a .40 caliber instead of a .45 caliber pistol certainly bolsters this Court's conclusion that Burks' convictions on Counts Ten, Eleven, Thirteen an Fourteen cannot stand. After all, a .45 caliber casing was found at the scene at C-Rays. This was in keeping with the Government's theory that a "twin .45" was used. However, none of this alters the Court's conclusion that it was not "against the manifest weight of the evidence," United States v. Hughes, 505 F.3d 578, 592 (6th Cir. 2007), for the jury to conclude that Burks was a member of the RICO conspiracy as alleged in Count One, and that he was also a member of the drug conspiracy alleged in Count Two.

United States v. Burks, No. 3:17-CR-00124, 2020 WL 2307338, at *2 (M.D. Tenn. May 8, 2020) (Burks II). Acknowledging that ruling, the Sixth Circuit explicitly chose not to address the matter in the appeal that was then pending. Burks I, 974 F.3d at 625.

## II.

Now before the Court is Burks' Third Motion for a New Trial (Doc. No. 1796), which is based upon the Government's failure to turn over the ROI and is directed at the counts related to Wright's murder, *i.e.*, Counts Ten, Eleven, Thirteen and Fourteen. That Motion, as with the prior motions for a new trial, has been exhaustively briefed by the parties (Doc. Nos. 1796, 1804, 1810).

"A motion for a new trial under Rule 33 of the Federal Rules of Criminal Procedure may be premised upon the argument that the jury's verdict was against the manifest weight of the evidence." Hughes, 505 F.3d at 592. "Generally, such motions are granted only . . . 'where the evidence preponderates heavily against the verdict.'" Id. at 592-93.

"In deciding Rule 33 motions based on the manifest weight of the evidence, . . . a district

4

judge 'may sit as a thirteenth juror' and consider the evidence to ensure that there is no miscarriage of justice.'" United States v. Monoz, 605 F.3d 359, 373 n.9 (6th Cir. 2010) (citation omitted). In this regard, the trial judge may assess the credibility of witnesses and the weight of the evidence. United States v. Reeves, 636 F. App'x 350, 353 (6th Cir. 2016); Lutz, 154 F.3d at 589 (6th Cir. 1998). Still, and as previously noted, while "[t]he decision of whether to grant a new trial is committed to the 'sound discretion of the trial judge,' . . . this discretion should be exercised 'only in extraordinary circumstance[s].'" Canal Barge, 631 F.3d at 357 (internal citations omitted).

Based on these exact same standards, the Court granted Burks' first Motion for a New Trial, but the Sixth Circuit has already determined that to be erroneous. Therefore, it would be a simple matter to deny Burks' present motion. After all, even if Dowlen on one occasion stated that the pistol may have been a .40 caliber instead of a .45 caliber, this misstatement might not, in the words of the majority opinion, change the fact that the Government "set out a straightforward narrative that the jury could reasonably believe," or its belief that "[t]he evidence . . . did not weigh heavily against the verdict." Burks I, 974 F.3d at 625. The Court does not find the issue that simple, however.

## A.

As this Court pointed out in its prior opinion, Dowlin was far from a credible witness as it pertained to Wright's murder, yet he was the Government's star witness on this issue. A six-time convicted felon, who "was in and out of jail for much of the time period covered by the Indictment" and was "on the run from a murder charge" when he allegedly heard Burks confess to Wright's murder, Dowlen's story contained too many holes to count. This Court explained:

> Sometime in December 2012 or January 2013, discussions at the cave [a Gangster Disciples safehouse] turned to the shooting at C-Rays, and Burks began speaking

5

about a security guard who had been interviewed after the shooting. Using his cell phone, Burks found a video of the interview on YouTube and showed it to [Danyon] Dowlen, [Marcus] Darden, and [Brandon] Hardison, who were also present. According to Dowlen, "it [the video] showed at the end – it was like in the end it showed where XGotti was found at the back of the – the back of C-Ray's exit on a – on like a deck, where he was found shot, I guess, deceased: There is crime scene tape around it." (Rough Trans. 3/18/2019 at 88). The questioning and answers continued as follows:

> Q. What happened next, Mr. Dowlen?
>
> A. I proceeded – I was – I was kind of – I was – I was shocked because this whole time – the whole time that that had happened, I never – I never knew that – that what had – that's what happened or none of that. I was under the assumption that Mr. Hardison had shot him.
>
> Q. Did you do anything or did you ask Mr. Burks any questions at that point?
>
> A. Nah, I didn't ask – I don't remember calling – recall – I don't remember asking him any questions. I just turned to Mr. Hardison and said, you know, this whole time I thought you – you shot him.
>
> Q. Was Mr. Burks armed at the time?
>
> A. Yes.
>
> Q. What was he armed with?
>
> A. He had a – a compact .45.
>
> Q. A .45 caliber pistol?
>
> A. Yes.
>
> Q. And after he made those statements to you, did you ask him anything about the pistol he had?
>
> A. Yes. I asked him, is that the pistol right there, because I know he kept a – a similar .45 on him. And he told me, nah, this is a twin to that. I said oh, I was under the assumption that Mr. Darden [sic?] had got away with his gun. . .

6

On cross examination, in response to the question of whether Burks told him he shot Wright, Dowlen responded:

> A. I – I said that Mr. Burks stated that. Once we was watching the video [of the guard being interviewed on the news] and seen that they showed on the video that he made it to the back deck of C-Ray's, that Mr. Burks stated he a bad mother F. He made it out there. I hit him in his head once and he was still crawling. I hit him again and he still made it out there.

Darden, 2019 WL 3946133, at *22–23 (internal citations to record omitted). This Court then stated that, "although the reference to the 'twin' .45 caliber pistol was admittedly a nice added touch," Dowlen's testimony "d[id] not square with the facts":

> Dowlen testified Burks said that he shot Wright in the head, but Dr. David Zimmerman of the Davidson County Medical Examiner's Office testified that Wright was shot in the abdomen and the leg, and that Wright did not sustain a head injury. Dowlen also suggested that Wright was shot and found by the back door of C-Rays, but both [Kristine] Gaskin [Wright's girlfriend], and Terry Minton, the Commander of the Clarksville Police Department Crime Scene Unit, testified that Wright went out the front door of C-Ray's.

Id. at 23. To top things off, Dowlen's testimony markedly changed with the passage of time:

> In a statement to agents, Dowlen said that Hardison probably killed Wright. Later, Dowlen changed course and pinned the blame on Burks. The Government explains this discrepancy as resulting from "Dowlen's mere prior speculation" being "later debunked." Elsewhere, the Government asserts that Dowlen "was surprised by [Burk's] admission to Wright's murder because, until that point, Dowlen had assumed that Hardison had killed Wright." Maybe so, but the "surprise" revelation from Burks allegedly occurred at the cave in December 2012 or January 2013. The Government provides no explanation as to why Dowlen held on to his (now debunked) assumption for more than a year when he told agents in January 2014 that Hardison "probably" killed Wright. Nor does the Government offer a plausible explanation for why Dowlen waited yet another year thereafter to reveal Burks' supposed confession.

(Id.) (footnotes and internal citation to record omitted).

The Government characterizes Dowlen's undisclosed statement about the pistol being either a .40 or .45 as a "one time memory lapse," a "one-time expression of uncertainty," or a "fleeting

7

memory lapse," (Doc. No. 1804 at 18, 20, 21), but the Court sees it as more than a simple one-off. Rather, having had the opportunity to watch, the manner, tone, facial expression and overall tenor of Dowlen's testimony, the Court believes this is a more emblematic problem of Dowlen when it came to Wright's murder. Dowlen would say whatever he thought the Government needed, or wanted, to hear.

The jury was presented with three undisputed facts pertaining to Wright's murder. First, he was shot and killed with a .45 caliber weapon, as evidenced by the caliber casing recovered at C-Ray's. Second, when Burks was arrested after a traffic stop on January 16, 2013, he had a .45 caliber pistol on him. Third, the .45 caliber Burks was found to possess during the traffic stop did not match the .45 used to kill Wright. This presented a dilemma for the Government, but was easily resolved when Dowlen proffered that the gun used to kill Wright was a .45 caliber "twin" to the one Burks was carrying when he was arrested. Problem is, of course, Dowlen did not know a month before trial whether the gun was actually a .45 or a .40, or at least the jury might have so concluded based upon the undisclosed ROI and the cross-examination that undoubtedly flowed therefrom. If Dowlen had testified at trial that Burks used a .40 caliber pistol to kill Wright, this would not fit the narrative. And this is something the jury most certainly should have heard and should have been given the opportunity to assess.

It is no answer, as the Government suggests, that "Defense counsel elicited a staggering body of impeachment evidence from Dowlen during cross-examination, including Dowlen's lengthy and serious criminal history, his history of providing false statements, his motive to fabricate testimony in the instant case, and the ways in which Dowlen's testimony was contradicted by other evidence in the case." (Doc. No. 1804 at 22). Nor is it sufficient that "Defense counsel then deployed this

8

impeachment evidence in the strongest possible terms during closing argument." (Id.). Defendant should have had the opportunity to explore the .40/.45 discrepancy because it was a point potentially pivotal to Burks' conviction, but he was unconstitutionally deprived of that opportunity.

**B.**

The failure to turn over the ROI violated the "Brady rule," which is "based on the requirement of due process." United States v. Bagley, 473 U.S. 667, 675 (1985). Brady v. Maryland, 373 U.S. 83, 87 (1963), on which the rule is based, held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." The same "holds true 'when the State, although not soliciting false evidence, allows it to go uncorrected when it appears.'" Brooks v. Tennessee, 626 F.3d 878, 894 (6th Cir. 2010) "[T]he tenet on which the Brady doctrine is based [is] that it is fundamentally unfair for the government to achieve a conviction through the concealment of evidence which undermines the strength of the government's case against the defendant." United States v. Presser, 844 F.2d 1275, 1282–83 (6th Cir. 1988)

The Brady rule requires that the prosecution disclose all exculpatory and impeachment evidence that is in the government's possession "in time for use at trial." Id. at 1283. "When the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within this general rule." Giglio v. United States, 405 U.S. 150, 154 (1972) (quoting Napue v. Illinois, 360 U.S. 264, 269 (1959)).[3]

---

[3] The Brady "obligation entails 'a duty to learn of any favorable evidence known to others acting on the government's behalf in the case," but "'does not impose an affirmative duty upon the government to take action to discover information which it does not possess.'" United States v. Smith, 749 F.3d 465, 492

9

Generally, "'the principles announced in Brady do not apply to a tardy disclosure of exculpatory information, but to a complete failure to disclose.'" Snow v. Nelson, 634 F. App'x 151, 155 (6th Cir. 2015) (citation omitted). Thus, "[w]here the United States ultimately hands over the Brady material that could be used to impeach a witness . . . there is no violation 'so long as the defendant is given [the] impeachment material, even exculpatory impeachment material, in time for use at trial.'" United States v. Fields, 763 F.3d 443, 458 (6th Cir. 2014) (citation omitted).

As a preliminary matter, the Government asserts that no Brady violation occurred because, during a bench conference, AUSA Ben Shrader (who was the lead prosecutor and attended Dowlen's debriefing) told the court and counsel that "he expected that Dowlen would testify that Burks 'had used a .45 caliber or a .40 caliber pistol in the homicide." This Court has already rejected that argument noting that "a cryptic statement during a sidebar conference"[4] was insufficient and, besides "Brady itself admits of no inadvertence exception[.]" Burks II, 2020 WL 2307338, at *3 (collecting cases).

Acknowledging that "the Court has effectively rejected the argument" about whether Dowlen's statement was adequately disclosed, the Government raises it again "to ensure the completeness of the record and as evidence of AUSA Schrader's belief that the[] ROI had in fact been disclosed to the defense prior to trial." (Doc. No. 1804 at 31 n. 11). This effort to complete the record raises yet another potential problem for the Government.

---

(6th Cir. 2014) (quoting United States v. Graham, 484 F.3d 413, 417 (6th Cir.2007)).

[4] For a prosecutor to say that he (the prosecutor) "expected that Dowlen would testify that Burks had used a .45 caliber or a .40 caliber pistol in the homicide" is entirely different from saying that Dowlen himself said in a pretrial interview – little more than a month before trial – that "he believed the gun" used by Burks to kill Wright "may have been a .40 caliber or a .45 caliber." (Doc. No. 1685-2 at 3). Besides, Dowlen did not testify that the gun was a .40 or .45, he said it was a .45. A .40 caliber pistol would not have fit the Government's narrative, or corresponded with the casings found at the scene.

"[A] due-process violation occurs 'when the State, although not soliciting false evidence, allows it to go uncorrected when it appears.'" Stumpf v. Robinson, 722 F.3d 739, 750 (6th Cir. 2013) (citation omitted). This is true even if "the false testimony goes only to the credibility of the witness." Napue, 360 U.S. at 269. "A lie is a lie, no matter what its subject, and, if it is in any way relevant to the case, the district attorney has the responsibility and duty to correct what he knows to be false and elicit the truth." Id. at 269-70.

Repeatedly on the stand, in response to questions from the prosecutor, Dowlen testified that the gun Burks had or referenced at the Cave as being used to kill Wright was a "twin" to the .45 Burks was then carrying. This may have been true, even considering the ROI. However, conspicuously absent from cross-examination was questioning involving Dowlen's waffling about the caliber of the gun just a month before trial. One would think that this lack of inquiry would have sent up a red flag to one or both of the prosecutors who were at trial and who attended the pretrial interview of Dowlen. Apparently, it did not.

Instead, the Government doubled-down during closing argument. Discussing the alleged interaction between Dowlen and Burks at the Cave shortly after the shooting (even though Dowlen believed for more than a year thereafter that Hardison was actually the shooter), the Government argued:

> Mr. Burks said something else that night to Mr. Dowlen. Because Mr. Dowlen saw a .45 caliber on Mr. Burks' hip. And he asked him, "Is that the gun? Is that the one you used?" Mr. Burks said it wasn't, that it was the twin. And that he had taken the gun that he used and thrown it away at a mill.
>
> Ladies and gentlemen, on January 26th, 2013, Mr. Burks was arrested. He was stopped in a car with Xavier Jenkins. The police found a .45 caliber firearm in that car. They recovered it. Mr. Burks pled guilty to possessing that firearm.
>
> And then you heard that the government compared that .45 caliber firearm to the .45

11

> caliber casing that was found at C-Ray's. What did [the firearms examiner] tell you about that? He told you they did not match. That is exactly what you should expect. Because that wasn't the gun he used to murder Mr. Wright. It was the twin. Just like Mr. Dowlen told you.

(Doc. No. 1514 Transcript at 79-80). Similarly, in response to Burks' first Motion for New Trial, the Government argued:

> Dowlen testified further that, at the time of Burks' admission to killing Wright shortly after the murder, BURKS was carrying a .45 caliber pistol on his person. Dowlen asked BURKS whether the .45 caliber pistol that BURKS had on his person was the pistol BURKS had used to commit the murder. BURKS replied that the .45 caliber pistol he was carrying was not the pistol BURKS had used to commit the murder but was instead its "twin," as in, an exact replica of the firearm that BURKS had used to kill Wright.

(Doc. No. 1443 at 27) (capitalization in original).

None of this is to suggest that the Government intentionally failed to disclose Dowlen's ROI. After all, the Government claims AUSA Shrader was the one who told the ATF to confirm Dowlen's statement in an ROI in the first place. Nor is it to suggest that the Government knew that it failed to disclose the ROI and then used that failure to its advantage.

What it is does suggest, however, is three things. First, Dowlen's statement was important because it was only his testimony that placed the .45 or its "twin" in Burks hands shortly after the shooting. Second, and relatedly, the Government's argument – that defense counsel was either asleep at the switch when it came time to cross-examining Dowlen, or decided as a matter of trial strategy not to question him about the discrepancies between what he testified to on the stand and what he said merely a month earlier – defies credulity. Third, and as an offshoot of the first point, it totally undermines the Government's fear that "a new trial would be warranted every time a defendant learned new information post-trial, however minor that information may be." (Doc. No. 1804 at 23).

12

## C.

A prosecutor's "failure to disclose evidence favorable to the accused . . . is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Bagley, 473 U.S. at 682. "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." Id..

This does not mean, however, "that the defendant 'would more likely than not have received a different verdict with the evidence,' only that the likelihood of a different result is great enough to 'undermine[ ] confidence in the outcome of the trial.'" Smith v. Cain, 565 U.S. 73, 75–76 (2012) (quoting Kyles v. Whitley, 514 U.S. 419, 434 (1995)); see also (stating that a "'reasonable probability' does not mean a certainty, or even a preponderant likelihood"). Thus, for example, "evidence impeaching an eyewitness may not be material if the State's other evidence is strong enough to sustain confidence in the verdict." Id. at 436. On the other hand, "if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt." United States v. Agurs, 427 U.S. 97, 113 (1976).

Obviously, the Court is not writing on a *tabula rasa*, and it has already explained in detail its reasons for lacking confidence in the jury's verdicts as they related to Burks and the murder of Wright at C-Ray's. Just as obviously, the Sixth Circuit has found that this lack of confidence to be unwarranted. That is the law of the case, which this Court accepts and applied herein.

Even so, having had a ringside seat at trial, and having had the opportunity to observe Dowlen and his demeanor during his three days of testimony, the Court's assessment of his credibility has not changed. It has only gotten worse, if that is possible.

Maybe Dowlen's statement to the ATF and the prosecutors that the gun was either a .40 or

13

a .45 caliber was just a simple misstatement, as the Government claims. Or maybe it was more in line with his insistence to the Government for more than a year that Hardison probably killed Wright, notwithstanding Burks' alleged confession (a day, or a month, or two months) after the murder that he (Burks) was the one who killed Wright.[5] At least counsel had the opportunity to cross-examine Dowlen about whether Hardison or Burks was the killer. Defense counsel did not, however, have that same opportunity when it came to the .40/.45 caliber discrepancy.

Moreover, the significance of the testimony and argument surrounding the .45 cannot be overstated. Leaving aside what has already been recounted, it must be borne in mind that the trial itself lasted 25 days over a span of six-weeks. The evidence was not presented in a linear, chronological, Defendant-by-Defendant, or count-by-count fashion. Rather, because of the number of Defendants and crimes charges, and because some witnesses had something to say about one or more Defendants and one or more crimes, the evidence was presented in a scatter-shot fashion. Yet, four thing stood out above all others when it came to the shooting at C-Ray's: (1) Hardison was sucker-punched earlier that evening at Sidelines by Ford; (2) an "all-hands-on deck" was called to which various Gangster Disciples responded; (3) Wright was killed by a .45 caliber bullet; and (4) Burks was alleged to have had the .45 that fired the bullet.

Forensic evidence introduced at trial established that a .45 caliber bullet killed Wright, but it was Burks' alleged confession to Dowlen that placed the gun in his hand. The other two witnesses to whom Burks allegedly confessed did not.

---

[5] Dowlen testified that the conversation about Wright's murder occurred at the cave in "December/January – January 2013 or December 2012." (Doc. No. 1474, Transcript at 98). Then again, Dowlen being Dowlen, the purported confession may have been the day after the shooting. At least that is what he told the Government during a proffer session on February 10, 2015. (Id. at 186).

14

Crediting Daniels's grand jury testimony, as the majority opinion requires, he testified that he was in C-Ray's parking lot on the evening of November 3, 2012 where several Gangster Disciples were conversing, including Darden, Hardison, and Xavier Jenkins. Shortly thereafter, Burks walked up to the group. A plan was formulated to enter C-Ray's and "execute" the person who had disrespected the Gangster Disciples, with Hardison saying, "'This N-word got to die.'" (Doc. No. 1321, Transcript at 49). There was also some mention about the need to avenge the earlier death of a Gangster Disciples by members of the Bloods. (Id. at 48). Darden then ordered his underlings into the club. Three to five minutes later, a crowd of people came screaming out of C-Ray's, and Daniels was told by Desmond Garrett that they could not leave until Burks came out, which he did 30 seconds or so later. (Id. at 57-59). Daniels also testified before the grand jury that, a couple of weeks later, he went to the theater with Burks, Dowlen, and Garrett and that, in response to Garrett "messing around," Burks said, "you keep playing around, . . . I'm gonna do you like I did that N-word at C-Ray's." (Id. at 60). Daniels did not mention a .45, and apparently neither did Burks during the alleged confession. And critically neither the grand jury nor the trial jury had the opportunity to evaluate all of the evidence, including the evidence disclosed by the government at trial.

Nor did Ford, the other person to whom Burks allegedly confessed.[6] All Burks told Ford – a rival gang member who sucker punched Hardison at Sidelines earlier that evening – was that "I hope they don't come get me on a bad motherf[****]r.". (Doc. 1475, Transcript 88). Notwithstanding Ford's novel definition of "bad motherf[****]r" as meaning a murder, the Sixth Circuit has already held that this was a plausible definition because "there are plenty of gang-related terms with nonobvious meanings" and "[t]he jury heard that the gangs used surprising terms for a

---

[6] At the time, Burks and Ford were in the same pod at the Grayson County Jail.

15

variety of illegal activity," Burks I, 974 F.3d at 627.  Even so, Ford never claimed that the "bad motherf[****]r" Burks' was worried about related to Wright, not did he say anything about Burks confessing to using a .45 to commit a "bad motherf[****]r."  Again, the trial jury did not consider Ford's testimony ever as characterized by the Sixth Circuit in light of the government's disclosure after trial.

**D.**

So, it all comes back to "Dangerous Dan" Dowlen and his testimony.  "[W]here . . . the Government's case may stand or fall on the jury's belief or disbelief of one witness, his credibility is subject to close scrutiny."  Gordon v. United States, 344 U.S. 414, 417 (1953).  After all, before the trial jury he is the one and only witness that put the firearm in Burks' hand that resulted in the murder.  And by any measure that is strong evidence.

In order to obtain convictions on Counts Ten, Eleven, Thirteen, and Fourteen, it was not necessary for the Government to prove that Burks used a .45 caliber pistol to murder Wright.  But his possession of such a weapon became important, if not critical, when he was found in possession of a .45 caliber weapon just a couple of months later.  His possession of a same caliber handgun that did not match the ballistics found at the scene would tend to be to be exculpatory, unless, of course, there were two .45's.

As he was wont to do, Dowlen stepped up and filled the gap in the Government's case: Burks told him and/or Dowlen saw him with a "twin" of the .45, with Burks telling Dowlen that the gun was an "exact replica" (Dowlen's characterization) of the one he actually used to kill Wright and the actual murder weapon had been thrown in "the mill."  This was a tidy solution to the problem except that, as Dowlen was also wont to do, his testimony and/or recollection of events changed.  A month

16

before trial, the twin .45 became either that or maybe a .40. This is hardly a distinction without a difference in the circumstances of this case.

Admittedly, a Taurus .40 caliber and a Taurus .45 caliber pistol look substantially alike based upon the pictures the Government attached to its response brief. (Doc. Nos. 1804-1, 1804-2). But the jurors should have been the ones to make the comparison, not the Court. And the jury would do so as it considered, as it must, the entire record evidence at trial.

Moreover, if the Court learned one thing during trial, it was that the Gangster Disciples knew drugs and they knew guns. As the Government stated in closing:

> You had access to guns, and guns are essential to drug dealing. Right? You need to carry a gun if you want to be protected from rival drug dealers, from being robbed.

(Doc. No. 1514 at 25). Likewise, in rebuttal, the Government argued that "guns are tools of the trade . . . used to protect your dope." (Doc. No. 1396 at 40). Dowlen, who previously held a "position of authority" as "chief of security" or "enforcer," (Doc. No. 1472, Transcript at 40) was seemingly quite knowledgeable about a wide-range of guns. He testified about various Defendants possessing guns: "SKs, AKs, handguns"; "HKs" (id. at 156); "40s .40 calibers." "9s Maybe .45"; "9 millimeters"; "pumps, 12-gauges, handguns, AR-15s." Id. at 150, 156, 184; Doc. No. 1473 Transcript at 34, 80). Whether he (or maybe Burks) simply mistook a .40 for a .45 is something the jury should have been allowed to consider in determining Dowlen's overall believability.

### III.

Burks' Third Motion for a New Trial will be granted. In so ruling, the Court recognizes that, given the outcome of the prior order granting a new trial, reversal once again is possible. The prior sentence should not be read as this Court's failure to defer to the Sixth Circuit's opinion in the first appeal. Respectfully, however, "only the trial judge can be aware of the variations in demeanor and

17

tone of voice that bear so heavily on the listener's understanding of and belief in what is said." Anderson v. Bessemer City, 470 U.S. 564, 575 (1985). This is because "'[f]ace to face with living witnesses the original trier of the facts holds a position of advantage from which appellate judges are excluded.'" Clemons v. Mississippi, 494 U.S. 738, 769 n.18 (1990) (citation omitted).

The original trier of fact in this case was, of course, the jury and its verdicts relating to Burks' murder of Wright are entitled to "substantial deference." Radvansky v. City of Olmsted Falls, 496 F.3d 609, 614 (6th Cir. 2007). By the same token, "[w]hen considering a motion for new trial based upon the weight of the evidence, district judges can act in the role of a 'thirteenth juror' and consider the credibility of the witnesses and the weight of the evidence to insure that there is not a miscarriage of justice.'" Lutz, 154 F.3d at 589. While the Government "set out a straightforward narrative that the jury could reasonably believe," Burks I, 974 F.3d at 625, important to that narrative was that Burks confessed to Dowlen (a day, or two days, or a few days, or a month, or two months) after Wright's murder that he used a .45 pistol to commit that crime and he had in his possession a "twin" to that gun. Weeks before trial, Dowlen was not so sure. At least that is what a reasonable jury may have concluded if Dowlen's ROI had been disclosed as required by Brady, and if counsel had been given the opportunity to cross-examine Dowlen on this very critical point. While others may respectfully have a different opinion, this Court believes that there is a reasonable probability that had the evidence been disclosed timely, the result at trial would have been different, so this Court is compelled to conclude that extraordinary circumstances exist to grant Burks a new trial.

An appropriate Order will enter.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE